In re SOUTHERN KITCHENS, INC., Debtor.

Sheridan J. BUCKLEY, Trustee for Southern Kitchens, Inc., Plaintiff,

v.

TRANSAMERICA INVESTMENT COR-PORATION, Mary McNutt Platzer and Phillip Crowley, Defendants.

Bankruptcy No. 95–31084.
Adversary No. 96–3349.

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Feb. 26, 1998.

Thomas M. Fafinski, Minneapolis, MN, for Plaintiff.

Michael H. Daub, Minneapolis, MN, for TransAmerica Investment Corporation and Mary McNutt Platzer.

Gary B. Bodelson, Minneapolis, MN, for Phillip Crowley.

## ORDER GRANTING DEFENDANTS' MOTION FOR DISQUALIFICATION OF PLAINTIFF'S COUNSEL

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding came on before the Court for hearing on the Defendants' motion for the disqualification and removal of Fafinski & Wallrich, P.A. ("F&W") as counsel for the Plaintiff. Michael H. Daub appeared for Defendants TransAmerica Investment Corporation ("TransAmerica") and Mary McNutt Platzer ("Platzer"). Gary B. Bodelson appeared for Defendant Phillip Crowley ("Crowley"). Thomas M. Fafinski appeared in opposition to the motion. Upon the moving and responsive documents, certain other files and records maintained by the clerk of this Court, and the arguments of counsel, the Court makes the following order.

## PROCEDURAL AND TRANSACTIONAL HISTORY[1]

The Debtor is a Minnesota corporation, founded in 1983 by Defendant Crowley. It was formerly engaged in the business of food assembly, packaging, and distribution, for customers in vending, institutional, and convenience-store settings.

This adversary proceeding was commenced out of the Debtor's second sojourn in bankruptcy, a Chapter 7 case begun on February 22, 1995 via an involuntary petition filed by several of its creditors. The Plaintiff is the trustee of the Debtor's estate in this case. Many of the events on which the Plaintiff bases his complaint, however, took place during the Debtor's earlier bankruptcy case, or shortly after it. That case was commenced by the Debtor's voluntary petition under Chapter 11 in mid–1993. F&W represented the Debtor in that case; its employment was approved by order of this Court (O'Brien, C.J.), on September 9, 1993.

When the Debtor went into Chapter 11, it was a publicly-held corporation with over 250 shareholders. Individuals named Sharon Gunberg and Lawrence Kem held substantial equity interests in it. Gunberg, Kem, and another individual named William Rieser were among the members of its board of directors.

TransAmerica is a Minnesota corporation. Platzer is its chief executive officer and its shareholder and director. She and TransAmerica entered the Debtor's Chapter 11 case via a post-petition transaction: TransAmerica purchased a secured pre-petition claim held by Bank Windsor, agreed to extend post-petition credit to the Debtor, and did so. This arrangement formed part of the structure of the Debtor's plan of reorganiza-

---

1. This recitation of facts applies to all of the theories argued by the Defendants. Other, more particular findings will be recited later in the discussion on individual theories.

tion. Under the plan, TransAmerica took a secured position against all of the Debtor's assets, and was granted the right to convert all or part of its claim to stock in the Debtor. TransAmerica also received the right to appoint three members of the Debtor's board. The plan identified those who would serve as the officers and directors of the reorganized Debtor as Crowley; one Peter A. Petrulo, a long-time employee of the Debtor; and TransAmerica's three unnamed appointees. It identified Crowley as the Debtor's post-confirmation president and chief executive officer, and Petrulo as its vice-president and secretary. It was expressly contemplated that Gunberg, Rieser and Kem would no longer be on the Debtor's board.

Judge O'Brien ultimately confirmed the plan on May 20, 1994.

Almost immediately thereafter, Gunberg—purporting to retain the status of a director—gave notice of a special meeting of the Debtor's board for May 27, 1994. She attended the meeting, as did at least one other member of the pre-confirmation board whose status was not preserved by the plan. Crowley attended and participated.[2] No one appointed by TransAmerica appeared. By majority vote, the attendees elected Gunberg as chair of the board; terminated Crowley's employment; and elected Petrulo as acting president. Rieser, however, purported to function as the Debtor's president thereafter, in alliance with Gunberg. Rieser and Gunberg then exercised control over the Debtor's business and assets for a period of several months, to the exclusion of anyone affiliated with TransAmerica.

Three other developments coincided with these events, or closely followed them.

First, under cover of a letter dated May 27, 1994, addressed to Thomas Wallrich of F&W, counsel for TransAmerica[3] set forth terms by which his client proposed to effectuate its commitment under the plan to infuse $275,000.00 in credit into the Debtor. The proposal was as follows: after charging a "Loan original [sic] fee" of $5,500.00, there was to be a credit of $193,000.00 for "Pay-off of TIC Loan F/K/A Bank Windsor," and then a credit of $67,250.00 for the post-petition, pre-confirmation advances that Trans-America had already made to the Debtor. The stated remainder of the commitment—$8,750.00—was then to be "applied to the unpaid rent, which is due and owing from [the Debtor] to [TransAmerica]."

In undated typewritten text at the end of the letter, followed by his signature but without a statement of official capacity, Crowley attested to his having read the terms and stated

> I ... understand and agree that distribution of the Loan Agreement and Convertible Note will be made as set forth above...[4]

The intent of this formulation was that TransAmerica was to put no new cash at all into the Debtor post-confirmation, at least pursuant to its funding commitment in the plan. The letter-agreement is ambiguous as to whether the assigned Bank Windsor claim was to have been considered as satisfied.[5]

The Debtor and TransAmerica then documented the $275,000.00 obligation by a loan agreement. This instrument stated on its face that it was "Dated as of June 1, 1994." Petrulo, as the Debtor's president, signed it on July 19, 1994.

The second development took place during the two months after the confirmation of the plan. Over this period TransAmerica advanced a total of $22,500.00 in cash to the Debtor. In mid-July, Gunberg gave Petrulo three promissory notes in favor of Trans-America, the face amounts of which aggre-

---

**2.** It is not clear from the record whether Crowley voted at this meeting, or was even allowed to do so.

**3.** At the time, Jon R. Hawks, Esq., represented TransAmerica.

**4.** The record does not reveal whether Crowley signed this before or after the Gunberg-instigated board meeting.

**5.** The phrase quoted from the itemization can be read as acknowledging the satisfaction of the debt in the hands of the transferee. On the other hand, the text later refers to the repayment of "the Loan amounts previously advanced" as a prerequisite for other events, and does not specify the origin or nature of those "amounts."

gated to $22,500.00, and asked him to sign them on behalf of the Debtor. He did so, over signature lines identifying him as the Debtor's president. These notes are dated July 11, 15, and 20, 1994.

The third development came out of Gunberg's personal bankruptcy case. That matter had been begun on October 1, 1993 under Chapter 11, but was converted to Chapter 7 early the following month. On May 27, 1994, F&W undertook to represent Gunberg individually in the defense of several adversary proceedings in that case.[6] At least one of these was for denial of discharge; the remainder were for determinations of dischargeability of debt. Neither the Debtor nor TransAmerica were named parties to any of these proceedings. F&W continued to represent Gunberg through the resolution of these matters.[7]

In late September, 1994, TransAmerica commenced a lawsuit in the Minnesota State District Court for the Tenth Judicial District, Washington County, against the Debtor, Gunberg, and Rieser. Alleging various breaches of the Debtor's bylaws and the covenants and other provisions of its plan of reorganization, TransAmerica asserted that Crowley and Mary E. Platzer[8] constituted the true, empowered board of the Debtor. It stated that this board had just resolved to terminate Gunberg's and Rieser's status and relationship with the Debtor. Alleging that the Debtor had failed to convene a special meeting of shareholders after Mary E. Platzer's request, TransAmerica sought declaratory relief to remove Gunberg and Rieser and to seat Crowley and Mary E. Platzer as the board.

On October 7, 1994, TransAmerica obtained a temporary restraining order from the Washington County District Court. Gunberg and Rieser were restrained from acting in any status for the Debtor, and were ordered to surrender possession of its assets and business premises. Crowley and Platzer were expressly empowered to conduct meetings of the Debtor's board. This order was replaced by a temporary injunction on December 22, 1994.

Ultimately, TransAmerica obtained entry of judgment on March 1, 1995. Under it, Crowley and Mary E. Platzer were established as the Debtor's board; Gunberg and Rieser were removed from any official capacity with the Debtor; and their ouster from the Debtor's premises and business was made permanent. None of the defendants in that action took an appeal from the entry of this judgment.

After the entry of the temporary restraining order, Crowley and Platzer acted as the Debtor's Board to pass a unanimous resolution to allow TransAmerica to foreclose its security interest in the Debtor's assets. During the foreclosure process, TransAmerica's counsel obtained access to the Debtor's post office box and mail drop. TransAmerica then collected and negotiated customers' payments on accounts receivable. At the latest, the Debtor's active business operations were terminated by the enforcement of the security interest.

## PLAINTIFF'S RETENTION OF FAFINSKI & WALLRICH, P.A.

On August 13, 1996, the Plaintiff submitted an application for authority to employ F&W as special counsel to the office of the United States Trustee pursuant to former Loc. R.Bankr.P. (D.Minn.) 405(a)[9] In it, he stated that he

---

6. Another attorney had represented Gunberg in both phases of her bankruptcy case.

7. That resolution was adverse to Gunberg; via an order and judgment entered on March 30, 1995 in ADV 4–93–455, Judge Nancy C. Dreher denied her a discharge under four different provisions of 11 U.S.C. § 727(a). She did so on three conclusions relevant to the matter at bar. The first was that Gunberg had no credibility whatsoever as a witness. The second was that she and Rieser had manipulated the French Accent's finances to extract hundreds of thousands of dollars to support their opulent lifestyle. The

third was that Gunberg had attempted to manipulate the process of her own bankruptcy case by fraudulently filing false schedules, and by professing to be unable to explain her pre-petition loss of valuable assets. (The assets included a large portion of her shares of stock in the Debtor.)

8. It is not clear whether this name identifies Defendant Platzer, or someone else.

9. Effective April 15, 1997, this rule was renumbered to Local Rule 2014–1(a).

[d]esire[d] to bring suit against Trans-America ..., and its agents, including Mary Platzer, (who is a director of Southern Kitchens, Inc.) for breach of [the Debtor]'s Reorganization Plan, wrongful foreclosure, breach of fiduciary duty, and wrongful pursuit of interest injurious to [the Debtor] in violation of MINN.STAT. § 302A.251(1), and require[d] special representation to pursue such claims.

The Plaintiff went on to state:

Trustee believes that the attorneys selected by Trustee do not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorneys are to be employed. Pursuant to 11 U.S.C. § 327(e) attorneys employed by a trustee for special purposes may not "hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed." [F&W] has previously represented Debtor in its Chapter 11 bankruptcy case and is a creditor of the estate. However, 11 U.S.C. § 327(e) does not preclude attorneys who have represented the debtor and who are creditors of the estate from serving as special counsel for purpose of recovering funds rightfully belonging the estate. [Citations and legal discussion omitted.]

. . .

[F&W] is particularly well suited to pursue a claim on behalf of the Trustee to recover funds rightfully belonging to the estate. Moreover, [F&W], as a creditor of the estate, has an interest in recovering funds for the estate and increasing the value of the estate for the benefit of all creditors. This position is consistent with that of the Debtor and the Trustee. Based upon the foregoing, [F&W] does not represent or hold any interest adverse to the debtor or to the estate within the meaning of 11 U.S.C. § 327(e) for the action contemplated and described herein.

Pursuant to the local rule, the application was supported by an unsworn declaration by Thomas G. Wallrich, Esq. In it, the declarant attested:

To the best of my knowledge, information and belief neither I nor [F&W] have represented or had any connection with Debtor, its creditors, or any other party in interest or their attorneys or accounts except that [F&W] has previously represented Debtor in a Chapter 11 case. 11 U.S.C. § 327(e) does not preclude attorneys who have represented the debtor and who are creditors of the estate from serving as special counsel for purposes of recovering funds rightfully belonging the estate.

[F&W], due to its familiarity with the claims and all the involved parties, is particularly well suited to pursue a claim on behalf of the Trustee to recover funds rightfully belonging to the estate. Moreover, [F&W], as a creditor of the estate, has an interest in recovering funds for the estate and increasing the value of the estate and increasing the value of the estate for all creditors. This position is consistent with that of the Debtor and the Trustee.

Based upon the foregoing [F&W] does not represent or hold any interest adverse to the Debtor or to the estate within the meaning of 11 U.S.C. § 327(e).

Neither I nor [F&W] "hold or represent any interest adverse to the estate" and we are "disinterested persons" within the meaning of §§ 327 and 1107 of the Bankruptcy Code.

Pursuant to former Local Rule 405(b),[10] counsel for the U.S. Trustee executed a Certificate of Review and Recommendation for the proposed employment, concurring in the application, and forwarded it to the clerk of this Court for filing. On that basis, an order authorizing the employment was entered on August 22, 1996.

## NATURE OF THIS ADVERSARY PROCEEDING

On October 2, 1996, F&W filed the complaint in this adversary proceeding on behalf of the Plaintiff. After a factual recitation that recapitulated most of the history noted previously, the complaint set forth seven causes of action in damages.

**10.** Now Local Rule 2014–1(b).

Two of these counts sounded against TransAmerica alone, under the theories of breach of contract (of the covenants in the Debtor's confirmed plan) and tortious interference with the Debtor's business relationships with its customers. One sounded against Platzer individually, under the theory that she had breached her fiduciary duty as a director of the Debtor. A fourth sounded against Crowley individually, under the theory that he had negligently or intentionally breached his statutory duties to the Debtor, by allowing Platzer and TransAmerica to take the actions they did. The remaining three sounded against all of the Defendants. Via two of them, the Plaintiff sought turnover of all assets of the Debtor that the Defendants retained, and to enforce the terms of the Debtor's confirmed plan against them. By the last one the Plaintiff sought (in vaguely-framed terms) to avoid TransAmerica's enforcement of its security interests as a preferential transfer. As relief, the Plaintiff prayed for an award of damages against all of the Defendants, in an amount equal to TransAmerica's stated commitment for post-confirmation financing, the amount of the accounts receivable that TransAmerica collected, and/or the value of the Debtor's loss of business, goodwill and intangible assets.

TransAmerica and Platzer filed a joint answer. Crowley answered separately. Denying most of the material and adverse allegations in the complaint, the Defendants all pleaded the Debtor's own breach of its plan at the instigation of Gunberg and Rieser as their central defense. They also pleaded various general equitable defenses—full performance, estoppel, reformation, and unclean hands. Crowley pleaded that he had "had no fiduciary duty to any of the creditors of [the Debtor]," as a consequence of which any of his actions could not have been a proximate cause of any damage to the creditors... Finally, after a lengthy recitation of facts, TransAmerica and Platzer alleged that Wallrich and F&W, by undertaking to represent Gunberg individually, at or before the time of the confirmation of the Debtor's plan, and without disclosing the retention to the Debtor's creditors, had rendered the plan unenforceable in light of Gunberg's and Rieser's subsequent actions.

## MOTION AT BAR

At a scheduling conference in this litigation, counsel for TransAmerica and Platzer raised the issue of whether F&W had a conflict in representing the Chapter 7 estate because it had represented the Debtor and/or Gunberg around the time of the events relevant to this adversary proceeding. Under the directive of a scheduling order, this motion followed. All of the Defendants join in the request for relief, which is to have F&W disqualified and removed. F&W strenuously objects to the motion.

The Defendants proceed on four different theories.

## DISCUSSION

### FEDERAL BANKRUPTCY LAW

1. 11 U.S.C. § 327(e).

■ 11 U.S.C. § 327(a) is the general statute that authorizes a trustee in bankruptcy to employ attorneys and other professional persons to assist the trustee "in carrying out the trustee's duties" under the Bankruptcy Code. It requires that such professionals be "disinterested persons." The definition of "disinterested person" under 11 U.S.C. § 101(14) bars professionals who hold prepetition claims against the estate from the generalized retention contemplated by § 327(a). *In re Pierce*, 809 F.2d 1356, 1362–1363 (8th Cir.1987); *In re Daig Corp.*, 799 F.2d 1251, 1253 (8th Cir.1986). *See also In re DeVlieg, Inc.*, 174 B.R. 497, 502 (N.D.Ill. 1994).

However, a trustee is authorized to employ special counsel to represent the estate for defined and limited matters:

The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

11 U.S.C. § 327(e). This was the statute under which the Plaintiff hired F&W to represent the estate for this adversary proceeding.[11]

■■■ Section 327(e) is designed to promote economy in administration. It recognizes that continuing the retention of pre-petition counsel/creditors will avoid wasteful expense and delay that might result from having to hire disinterested counsel unfamiliar with the subject matter. *In re Bowman*, 181 B.R. 836, 847 (Bankr.D.Md.1995).[12] The statute sets forth three prerequisites for the retention of special counsel. Only one is relevant to the motion at bar: the proposed attorney must not hold or represent an interest that is adverse to the estate with respect to the matter for which the attorney would be employed. *In re DeVlieg, Inc.*, 174 B.R. at 502; *In re Brennan*, 187 B.R. 135, 155 (Bankr.D.N.J.1995).[13]

■■■ This requirement prevents the employment of special counsel who, on any matter of substance, represent or have represented a client that is an actual or potential

opponent of the estate in the dispute for which counsel would be engaged.[14] General principles governing attorneys' conflicts of interest apply in determining the adversity of the interests of proposed counsel's other clients. *In re Bolton–Emerson, Inc.*, 200 B.R. 725, 732 (D.Mass.1996); *In re Roberts*, 46 B.R. 815, 827 (Bankr.D.Utah 1985). Refining the formulation to the context of bankruptcy, one early decision noted:

> To "hold an interest adverse to the estate" means (1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.
>
> To "represent an adverse interest" means to serve as agent or attorney for any individual or entity holding such an adverse interest.

*In re Roberts*, 46 B.R. at 827.

■■■ Given the fact-specific nature of parties' interests and their alignments, however,

**11.** The Plaintiff and F&W readily acknowledge that the large unsatisfied claim that F&W holds, for attorney fees incurred during the Debtor's Chapter 11 case, prevents from it being a "disinterested person." This is of no real moment, as the Plaintiff did not hire F&W to handle legal matters generally for the estate.

**12.** By definition, special counsel do not exercise more general control over the estate. This defuses the perceived and actual conflicts that might arise from their lack of disinterestedness; the trustee controls the administration and payment of special counsel's pre-petition claims, and is charged to do so without favor to the claimant.

**13.** The other two are: 1. the employment is in the best interests of the estate—that is, the subject claim has merit and value, and counsel has relevant expertise and/or familiarity with the claim—and 2. the special purpose "must not rise to the level of conducting the bankruptcy case" for the estate. *In re Brennan*, 187 B.R. at 155. *See also Meespierson Inc. v. Strategic Telecom Inc.*, 202 B.R. 845, 847 (D.Del.1996); *In re DeVlieg, Inc.*, 174 B.R. at 502.

**14.** This conclusion requires a construction of § 327(e) that has the phrase "with respect to the matter on which such attorney is to be employed" modifying the word "interest," rather than the concept of the "representation." This reading disqualifies a broader range of profes-

sionals from serving as special counsel. The other construction, however, would render the statute a nullity; basic principles of nonbankruptcy law, in lawyers' professional responsibility rules and in the common law of fiduciaries, already prohibit attorneys from formally representing two sides to the same dispute, overtly or covertly. The interpretation now adopted will free special counsel from more subtle pressures to compromise the estate's interests: those that naturally spring from the ties of ongoing, larger-scale retention on other matters, or even a single engagement of exceptional intensity and involvement in the recent past. Arrayed against a single assignment from a bankruptcy estate, limited in scope and duration and not as likely to furnish valuable continuing work in the future, such relationships could quietly erode a special counsel's zeal. Of equal concern, they cast third-party doubt on that zeal, no matter how it is maintained in fact. *In re Nat'l Distrib. Whse. Co., Inc.*, 148 B.R. 558, 561 (Bankr.E.D.Ark. 1992) (§ 327(e) should "prevent even the appearance of conflict, irrespective of the integrity of the person or firm under consideration"); *In re Interstate Distrib. Center Assoc. (A), Ltd.*, 137 B.R. 826, 831 (Bankr.D.Colo.1992) (special counsel must not only avoid actual, pointed conflicts, but be "above suspicion") (quoting *In re Roberts*, 46 B.R. 815, 838 (Bankr.D.Utah 1985)). The broader reading must be the correct one; it promotes the fiduciary loyalty of the trustee and the estate's agent much more effectively.

"no general rule of simple application [of § 327(e)] can be gleaned..." *In re Tidewater Mem. Hosp., Inc.,* 110 B.R. 221, 228 (Bankr. E.D.Va.1989). Each case must finally turn on its own circumstances, based on a common-sense divination of adversity or commonality. *Id. See also In re Mican Homes, Inc.,* 179 B.R. 886, 888 (Bankr.E.D.Mo.1995).

 In the process of identification, however, *potential* conflicts on the subject dispute are just as disqualifying as actual, current ones. *In re Nat'l Distrib. Whse. Co., Inc.,* 148 B.R. at 561. Regardless of whom a trustee has identified as an opponent, if a past or present client of proposed counsel was involved in any way with the events that gave rise to the dispute, or could otherwise be the subject of a claim based on those events, the client has an interest adverse to the estate and disqualification results. Several courts have applied this rule in denying approval of proposed employment under § 327(e), or in disqualifying counsel after the fact of employment. *E.g., In re Mican Homes, Inc.,* 179 B.R. at 888 (client was codefendant to debtor, with some overlap of financial exposure); *In re Argus Group 1700, Inc.,* 199 B.R. 525, 531–532 (Bankr.E.D.Pa. 1996) (client was insider in control of debtor, and was real party-in-interest to possible proceedings to oust debtor's management); *In re Ginco,* Inc., 105 B.R. 620, 621–622 (D.Colo.1988) (client was insider of debtor, codefendant in subject lawsuit, and "potential target for claims of corporate mismanagement" of debtor); *In re F & C Internat'l, Inc.,* 159 B.R. 220, 222 (Bankr.S.D.Ohio 1993)

(client was potential but unsued defendant to claims asserted by estate).

In all of these holdings, there is a common theme: all professionals for a bankruptcy estate must

> tender undivided loyalty and *provide untainted advice and assistance* in furtherance of their fiduciary responsibilities,

*In re Bolton–Emerson, Inc.,* 200 B.R. at 732 (quoting *Rome v. Braunstein,* 19 F.3d 54, 58 (1st Cir.1994)) (emphasis added). Expressed another way,

> ... the trustee should have an advisor *impartial as between creditors...,*

*In re NRG Resources, Inc.,* 64 B.R. 643, 647 (W.D.La.1986) (emphasis added), and certainly *as among potential defendants.*

For their motion as a whole, the Defendants rely mainly on F&W's defense of Gunberg in her discharge and dischargeability litigation as the disqualifying connection. This engagement began on May 27, 1994, the date of Gunberg's and Rieser's first strike in the struggle for control of the reorganized Debtor.[15] The simultaneity in time may be coincidental, or may not. There is no evidence that the retention continues, and one can assume that it was over by the time this adversary proceeding was sued out.[16] The fact that the connection is past and completed, however, does not matter: sensitivity to the sway of even a diffuse surviving sense of loyalty, n. 14 *supra,* makes it relevant to 5327(e).

 As reduced by the foregoing analysis, then, the question is whether Gunberg's

---

**15.** The date on which the Gunberg retention began is a point of controversy. The Defendants posit that the retention started on May 27. They point to F&W's statement to that effect in a memorandum prepared in February, 1996, by Steven H. Silton, a F&W associate, for a Hennepin County District Court action in which another of Platzer's business entities sued Gunberg and Kem. F&W was representing Kern in that matter. Silton attempted to retract his statement in a declaration prepared for this proceeding; he now says that he "inaccurately indicated" May 27 as the date of retention in the earlier memorandum, and that the correct date was June 3, 1994. However, F&W cannot have the benefit of hindsight on a fact averment like this. The earlier recitation was made in response to an accusation that F&W had a similar conflict for that action, arising out of its successive representa-

tion of the Debtor in its Chapter 11 case, Gunberg in her discharge/dischargeability proceedings, and then Kem in the Hennepin County District Court action. The date on which the Gunberg retention commenced may not have been pivotal to the conflict issue before the Hennepin County District Court, but it was of some moment. Set forth by F&W for reliance by that court, Silton's statement of fact now binds F&W by judicial estoppel.

**16.** The Defendants do not allege that F&W is furnishing counsel to Gunberg for the purposes of this adversary proceeding in any way. Nor do they allege that F&W is representing Gunberg on any other legal matters whose duration in time overlaps with this matter.

interests were or are adverse to the bankruptcy estate "with respect to" this adversary proceeding.

Under the Plaintiff's theory of suit, *as pleaded by F&W*, they are not. As the Plaintiff would have it, the Debtor's downfall was due to TransAmerica's failure to carry out its funding commitment by a cash infusion, and the subsequent enforcement of its lien.

However, the defense pleads a different story: the attempted coup by Gunberg and Rieser, their retention of control during a critical period of post-confirmation operations, the continuation of their predatory management style, and the resultant destruction of creditors' and suppliers' confidence in the reorganized Debtor took its operations over the cliff right when its fortunes could have been saved.[17]

For the purposes of this motion, one has to assume that the pleadings present a good-faith dispute on this point. It exists on several levels. The threshold issue is legal, and requires a construction of the plan provisions that governed TransAmerica's post-confirmation funding obligation: Did TransAmerica have the right to take all those credits against the face amount of the obligation, relieving it of any duty to put more cash into the Debtor? If the result on this issue is favorable to TransAmerica, the Plaintiff's suit might end right there. However, if under any theory it did get beyond that, the issue would then be one of fact, and of causation: did Gunberg's and Rieser's post-confirmation actions prevent the Debtor from commencing performance under the plan? If they did, the Plaintiff's charge that TransAmerica illegally manipulated its secured position is mooted. If they did not, the claims made under the Plaintiff's complaint would be addressed—and only then.

In light of all of the parties' pleadings, these are the real issues in suit, and must be addressed in just that order. The aspect that sets off a warning, however, is the identity of the named defendants, compared to the breadth of the cast of characters. Gunberg is not a party-defendant to this adversary proceeding. The pleadings—drawn by F&W—clearly do not contemplate her as a responsible party. There is no other pending proceeding in which her liability could be actually adjudged. Her personal interests are not directly in play, in the sense of being subject to a binding adjudication. However, the Defendants clearly seek to affix blame to her, to defeat the Plaintiff's various claims on their causation element. The adjudication of these issues, then, could produce a finding that Gunberg harmed the estate in the very sequence of events that is the basis of the estate's causes of action here. Even though that finding would not be binding on Gunberg, it would establish an adverse interest under § 327(e).[18]

The issue under § 327(e) is inextricably intertwined with the merits of the Plaintiff's claims. Admittedly, this is due entirely to the Defendants' pleading, and courts must be sensitive to the possibility of strategic abuse of disqualification motions.[19] However, the sequence of uncontroverted facts is enough to lay that concern to rest. The record manifests a meritorious dispute over the reason for the reorganized Debtor's failure, in which a persisting struggle for control of a

---

17. Gunberg's and Rieser's imposture of continuing authority did expressly contradict the Debtor's plan. When the Washington County District Court ordered judgment for TransAmerica on March 1, 1995, it held that the confirmation of the plan had removed Gunberg, Rieser, and Kem from the board. The Debtor was a named party to that action; as a result, the Plaintiff is collaterally estopped from denying that this was the intention of the plan.

18. There is already evidence of record that would support such a finding. In a declaration submitted for this motion, Petrulo states that he resigned from his position with the Debtor within six weeks of Gunberg's and Rieser's takeover, out of dissatisfaction with the way they were again running things. He also says that he had to consult Wallrich on legal matters for the company during that time: that Wallrich never disclosed his concurrent retention by Gunberg; and that had he known of the retention he would have discharged Wallrich as corporate counsel due to the contemporaneous adversity of Gunberg's and the Debtor's interests.

19. *Harker v. Comm'r of Internal Revenue*, 82 F.3d 806, 808 (8th Cir.1996); *Cook v. City of Columbia Heights*, 945 F.Supp. 183, 185 (D.Minn.1996); *North Star Hotels Corp. v. Mid–City Hotel Assoc.*, 118 F.R.D. 109, 112 (D.Minn.1987). *See also In re DeVlieg, Inc.*, 174 B.R. at 504.

troubled company was a central incident. Resolution of this issue is inherently fact-bound, and the process may well be complicated. If it is found that the Debtor failed due to buccaneering on the part of Gunberg and Rieser, regardless of any breach of the Defendants' duties under the plan, the adverse interest would be proven.[20] This finding, however, would come only after long litigation and trial. In the meantime, the estate's fortunes in this lawsuit would have been in the hands of counsel whose judgment might have been affected by the intangible but persisting influence of past loyalty. Even were the estate to establish its theory of causation, the result could be tarnished by a persisting suspicion that Gunberg's role was covered up.

The Bankruptcy Code—its ethos as well as its letter—entitles the estate to more rooted integrity in its ongoing administration, than that. Litigation like this cannot go ahead under the pall that its architects may not have analyzed, structured, and pled it with full detachment, and may be influenced by continuing loyalty to an unsued agent of the Debtor's downfall. Because of F&W's past ties to that alternate defendant, it is deemed not to have the capacity to make an independent judgment on its former client's culpability and exposure. *In re Bohack Corp.*, 607 F.2d 258, 263 (2d Cir.1979) (decided under comparable provisions of Bankruptcy Act of 1898). An axiom controls here, whose vernacular phrasing belies its weight in this context:

> ... the conduct of bankruptcy proceedings not only should be right but must seem right.

*Id.* (quoting *In re Ira Haupt & Co.*, 361 F.2d 164, 168 (2d Cir.1966)).

Because of the possibility that its former client is liable for the damage that it attributes to the Defendants, F&W must be deemed to have represented an interest that is adverse to the estate on the subject matter of the suit it has brought on behalf of the estate. It was and is not qualified under § 327(e) to represent the estate on this adversary proceeding, and must be removed.

### 2. FED.R.BANKR.P. 2014(a)

FED.R.BANKR.P. 2014(a) governs the content of applications made pursuant to any provision of 11 U.S.C. § 327. In pertinent part, it provides:

> The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

The disclosure required by this provision goes to matters substantially broader than those contemplated by either §§ 327(a) or 327(e). It goes to both actual and potential conflicts. *In re Marine Power & Equipment Co., Inc.*, 67 B.R. 643, 647 (Bankr.W.D.Wash. 1986); *In re Roberts*, 46 B.R. at 839. Regardless of how attenuated such connections may be, they must be revealed in the statement. *In re Crivello*, 194 B.R. 463, 466 (Bankr.E.D.Wis.1996). The purpose of this mandatory disclosure is to allow interested parties—including the Court and the United States Trustee—to thoroughly evaluate the proposed professional's status for any conceivable conflict or other disqualifying factor under those statutes. *In re Pierce*, 809 F.2d at 1363 n. 20; *In re Film Vent. Internat'l, Inc.*, 75 B.R. 250, 253 (9th Cir. BAP 1987); *In re Black & White Cab Co., Inc.*, 175 B.R. 24, 25 (Bankr.E.D.Ark.1994).

As noted previously, the Plaintiff submitted a declaration by Thomas Wallrich with his application for approval of his employment of F&W, to comply with FED. R.BANKR.P. 2014(a) and former LOC. R.BANKR.P. (D.MINN.) 405(a). That declaration includes a blithe, bland, and general denial of any representation or connection with "any other party in interest or their attorney or accountants," with the exception of F&W's representation of the Debtor in its Chapter 11 case.

---

**20.** There is already some evidence of record to support such a finding in Petrulo's statements. The loss of a second long-term key production and management employee, within six weeks of the departure of the other, must have been staggering.

This statement is wrong. There are at least two reasons.

The first, of course, goes to its past representation of Sharon Gunberg—a continuing shareholder of the Debtor, a creditor herself,[21] and a person intensely involved in events surrounding the Debtor's death throes. The omission of disclosure as to this connection is stunning. No more need be said.

The second goes to F&W's past multiple engagements by Lawrence Kem. Kem was another of the Debtor's shareholders, and had been frequently allied with Gunberg and Rieser. With them, he was an active participant in managerial maneuvering through several interlocked companies that included the Debtor, in transactions and litigation that involved TransAmerica, Platzer, and other entities in which Platzer was a principal. F&W represented Kem in the Chapter 11 case of the *French Accent, Inc.*, BKY 4–92–6760, a company controlled by Gunberg and Rieser that had been involved with the Debtor in large-scale and questionable dealings.[22] This retention included proceedings in the French Accent's main case, as well as the defense of Kem and one of Kem's other business entities in an adversary proceeding commenced by the operating trustee. F&W also represented Kem in the Hennepin County District Court lawsuit noted earlier, in which another of Platzer's business entities was his opponent.

There is no denying that the clients in these retentions were parties in interest within the contemplation of Rule 2014(a).[23] The egregiousness of the nondisclosure is particularly heightened where at least one of the connections—that with Gunberg—gave rise to a direct disqualifying conflict for this litigation.

■■■ The Bankruptcy Court may, in its discretion, disqualify counsel, or deny compensation, as a sanction for failure to make the disclosure required by Rule 2014(a). *In re Pierce*, 809 F.2d at 1362–1363; *In re Rothwell*, 159 B.R. 374, 378–379 (Bankr. D.Mass.1993). This sanction is particularly appropriate where the undisclosed connections are material to counsel's basic qualification under §§ 327(a) and 327(e). F&W's failure to disclose the connections previously noted is a separate basis for its disqualification—and, in the case of the connections with Gunberg, a cumulative one. *In re Leslie Fay Cos., Inc.*, 175 B.R. 525, 533 (Bankr.S.D.N.Y. 1994) (citing *In re Rusty Jones, Inc.*, 134 B.R. 321, 345 (Bankr.N.D.Ill.1991)).

### MINNESOTA RULES OF PROFESSIONAL CONDUCT

The bar of this court consists of those attorneys licensed to practice before the United States District Court for this district.

Former Loc.R.Bankr.P. (D.Minn.) 103(a).[24] In turn, the United States District Court for the District of Minnesota has adopted the Minnesota Rules of Professional Conduct, as prescribed by the Supreme Court of Minnesota. Loc.R. (D.Minn.) 83.6(d); *Bieter Co. v. Blomquist*, 132 F.R.D. 220, 223 (D.Minn.

---

**21.** Gunberg was one of the several petitioners who put the Debtor into Chapter 7 involuntarily.

**22.** Some time before the French Accent's Chapter 11 filing, Gunberg moved the Debtor's operations to the French Accent's business premises, and set up some sort of lease arrangement. She then extracted funds from the Debtor to pay the French Accent's expenses. She later tried to reconcile these transactions by purporting to give the Debtor credit on its rent obligations for the funds extracted for the French Accent's operations. This did not result in a wash; the operating trustee in the French Accent's case pursued the Debtor on a rent claim of several hundred thousand dollars, and the liquidation of that

claim was one of the precipitants of the Debtor's own Chapter 11 filing.

**23.** The layering of connections among all of these persons and entities is dizzying. Its complexity alone raises the possibility of other conflicts in the other bankruptcy cases. The most salient one is suggested by its retention by Kem for the matters described—after it had agreed, as a condition for obtaining court approval of its employment in that case, not to represent him "with respect to any matter concerning the [D]ebtor during the course of [its] Chapter 11 case."

**24.** Now Loc.R.Bankr.P. (D.Minn.) 9010–3(a).

1990); *North Star Hotels Corp. v. Mid–City Hotel Assoc.,* 118 F.R.D. at 110–111.

The Defendants argue that state-law principles disqualify F&W, under two different theories. They base both arguments on allegations by Crowley and Petrulo. Crowley's is that, when presented with TransAmerica's May 26, 1994 proposal for the crediting of its funding obligation, he sought Wallrich's advice as to whether he should agree to it, and Wallrich told him to go ahead. Petrulo's is that he consulted Wallrich before signing all four of the promissory notes, July, 1994, as to their conformity with TransAmerica's duties and the Debtor's rights, and that Wallrich advised him to sign them. The Defendants contrast these statements with the fact that the Plaintiff, in pleadings drafted by F&W, now attacks TransAmerica's proposal as a breach of the plan and its effectuation as the cause of the Debtor's failure.

### 1. Minn.R.Prof.Cond. 1.9

The Defendant's first theory is that F&W is disqualified due to a "former client conflict of interest." Under Minnesota law, this argument is governed by Minn.R.Prof.Cond. 1.9:

> A lawyer who has formerly represented a client in a matter shall not thereafter:
>
> (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or
>
> (b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known.

This rule, and those like it, reflect the precept that an attorney's fidelity to a client is always to prevail over a future opportunity to be retained by a different client that has conflicting interests on the subject matter of the same retention. It is designed to prevent adverse use of the former client's confidences; breach of the former client's continuing trust; and, more remotely, attorney abuse of a client in anticipation of future retention by the client's current or future opponent. *See, in general,* C. Wolfram, Modern Legal Ethics § 7.4.2 at 359–362 (1986).

▮▮ For these reasons, attorneys are generally prohibited from attacking the work they have done for a former client. *E.g., In re Gant,* 293 Or. 130, 645 P.2d 23, 26 (1982), *mod. on other grounds,* 293 Or. 359, 647 P.2d 933 (1982) (attorney who represented wife in obtaining decree of marital separation by default may not represent husband in motion to set aside decree). The Minnesota rule expressly contemplates that, after representing one party in the formation of a contract, an attorney may not seek to rescind the contract for the benefit of the other party. *Comment—1985* to Minn.R.Prof.Cond. 1.9. Several courts have ruled likewise, on the basis of similar rules. *Cord v. Smith,* 338 F.2d 516, 524–526 (9th Cir.1964); *In re Evans,* 113 Ariz. 458, 556 P.2d 792, 795–796 (1976).

▮▮▮ At first glance, one wonders whether these principles apply here. The Plaintiff, as a trustee in bankruptcy, is acting as a successor-in-interest to the Debtor itself, suing out causes of action for breach of contract and the like, that the Debtor held before it went into involuntary bankruptcy.[25] So the question arises: if the Plaintiff is in fact a successor to the Debtor as to these causes of action, and if a bankruptcy estate attributable to the debtor was the client in both of F&W's engagements, is F&W in fact

---

**25.** A trustee under Chapter 7 administers the assets of the estate, by collecting them and reducing them to money. 11 U.S.C. § 704(1). As a general matter, the property of the estate includes "all legal or equitable interests of the debtor and property as of the commencement of the case." 11 U.S.C. § 541(a)(1). This includes causes of action and claims in litigation that the debtor held as of the commencement of its bankruptcy case. *E.g., In re B.J. McAdams, Inc.,* 66 F.3d 931, 935 (8th Cir.1995); *In re Ozark Restaurant Eqt. Co., Inc.,* 816 F.2d 1222, 1224 (8th Cir.1987), *cert. den.,* 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987); *Carlock v. Pillsbury Co.,* 719 F.Supp. 791, 855 (D.Minn.1989). To the extent such rights are not allowable to the debtor as exempt, a trustee takes them up and may liquidate them for the benefit of creditors. This is why this matter is in suit at the Plaintiff's instance.

representing a client different from its former one, the debtor in possession under Chapter 11?

One has to recognize the fine-tuning of the different forms of bankruptcy relief to address this question; but when one does, the answer is that, indeed, there have been two different clients.

As the steward of the estate in Chapter 11,[26] a business in reorganization often has to place itself in a more conciliatory and compromising position. The limitations of Chapter 11 remedies, debt and asset structures, and capital availability often require it to compromise the strict legal remedies it might otherwise assert against creditors. It does so for several reasons: to avoid conflict that could result in adverse court decisions potentially harmful to its survival as a going concern: to avoid the high transactional costs of litigation; and to preserve long-term creditor goodwill for exploitation after its recovery. In short, it often retreats, in whole or in part, to survive the day and to ensure its return.

The trustee in a Chapter 7 case, on the other hand, does not deal with an ongoing dynamic. The trustee's job is to organize, spruce up, and liquidate the wreckage of a failed business—to recover value out of assets that are almost invariably out of operation, and causes of action that are based on frozen, past facts. Almost never presiding over a going concern, and only rarely having

to defer to the interests of employees and surrounding community, the trustee in liquidation has a very different worldview. The trustee generally does not elevate creditor goodwill over the estate's gross recovery, and properly insists much more strongly on the estate's strict legal rights as a primary and continuing position. The corollary, of course, is that the trustee's counsel—especially special counsel—take a much more substantial role in decision-making during the estate's litigation.[27]

The central conflict of facts under this part of the Defendants' argument illustrates the distinctiveness of these interests, and supports the conclusion that there have been, indeed, two different clients in succession. An attorney could well have concluded that the best interests of the debtor, fresh out of Chapter 11, lay in acquiescing to TransAmerica's formulation. One could envision a strategy of buying peace and inducing TransAmerica's forbearance in the enforcement of its secured claim, particularly if coupled with reliance on an energetic sales and production effort to jump-start the Debtor's cash flow. To opposite effect, Wallrich denies that he ever advised Crowley to agree to TransAmerica's formulation.[28] The possibility that he did, however, cannot be dismissed out of hand; for the reasons just recited, there is some credibility to Crowley's statement.[29] The same can be said for Petrulo's.[30]

---

26. A debtor in possession under Chapter 11 has "all the rights, ... and shall perform all the functions and duties, ... of a trustee serving in a case under" Chapter 11. 11 U.S.C. § 1107(a). 11 U.S.C. § 1106(a) in turn specifies the fiduciary duties of a Chapter 11 trustee, which include many of those assigned to a trustee under Chapter 7.

27. This also stems from the fact that the client, ultimately, is a legal construct created long after the subject events. The estate has a much more attenuated relationship with the facts than the actual participants would, were they or their business entity the real parties in interest.

28. This denial is in a declaration submitted for this motion.

29. His statement is also enhanced by some external consistency. The Debtor's post-confirmation solvency was critical to its commencement of performance under the plan, and Crowley obviously was concerned about that. He knew that

the form of TransAmerica's cash infusion was crucial. The structuring of the cash infusion was in large part a legal issue, appropriately entrusted to the Debtor's Chapter 11 counsel. One can understand why Crowley may have wanted to check with counsel as to whether TransAmerica's proffer conformed to the plan, before formally binding the Debtor to it.

30. As Petrulo and the Defendants point out, the sequence and circumstances under which he executed the four notes seem not to make sense, unless he did so on advice that TransAmerica's $275,000.00 commitment had been fully met by the terms proffered to Crowley. Otherwise, the post-confirmation advances totalling $22,500.00 would have been rolled into the obligation evidenced by the $275,000.00 note. Wallrich does not specifically deny giving such advice to Petrulo. More generally, he avers:

At no time did I represent to any party that pre-confirmation funding could be applied to the post-confirmation obligation.

By contrast, the interests of the Chapter 7 estate arose at a later date, and after a crucial divide: the cessation of the Debtor's business. The Chapter 7 estate has very little to gain from a posture friendly to a secured creditor situated like TransAmerica; to the extent that the Plaintiff generated sufficient evidence after a reasonable investigation into the facts and law, he had every right to sue to recover damages from the parties that he thought had caused the Debtor's failure. If his conclusion were that TransAmerica and its allies were responsible—rather than Gunberg, Rieser, and theirs—the estate's best interests would lie in challenging the validity of TransAmerica's proposed effectuation, and denying that the Debtor had consented to it.

For many substantive purposes peculiar to bankruptcy law, the debtor in possession, the reorganized debtor, and the Chapter 7 estate in two successive cases involving the same business entity may be deemed to have identical interests, and to be mutually bound by the actions of any of them. When the frame of reference is shifted over to a state rule of professional responsibility, however, and the task is to ascertain whether counsel has a conflict of interest, the criteria are not the same and a different conclusion may be required. For the matter at bar, the interests, goals, and strategic mindset that must be attributed to the reorganized Debtor on the one hand, and the Chapter 7 estate on the other, are distinct enough that the two must be deemed to be different clients, for the limited purposes of applying MINN.R.PROF. COND. 1.9.

■■■ As with the inquiry under § 327(e), the disqualifying circumstance is not raised by the Plaintiff's pleadings, but by his opponents' theory of defense, and its existence is a contested issue of fact at this early stage. Again, the courts must be aware of ulterior motives for disqualification motions, and must be guided by an

> "awareness of the delicate balance which must be maintained between the right of an individual to retain counsel of his free choice" and the need for upholding ethical standards . . .

*Buysse v. Baumann–Furrie & Co.*, 448 N.W.2d 865, 868 (Minn.1989) (quoting *Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1576 (Fed.Cir.1984)). However, the possibility that the Defendants might prevail on the fact issue common to the merits and this motion must be sufficient to disqualify F&W. If Wallrich did, in fact, counsel Crowley to assent to TransAmerica's proffer and Petrulo to acknowledge its effectuation, his law firm is now attacking an act that his former client took on his advice. That is just not tenable under Rule 1.9. This, then, is a third basis for disqualifying F&W.[31] *Cf. In re Statewide Pools, Inc.*, 79 B.R. 312, 314 (Bankr.S.D.Ohio 1987) (suggesting that counsel's pre-petition role in drafting documents challenged by estate's litigation may create disqualifying interest in defending them and preserving integrity of transfers effectuated by them).

### 2. MINN.R.PROF.COND. 3.7

■■■ The Defendants' final theory also arises under Minnesota law, which generally prohibits an attorney from undertaking an engagement where he or she is likely to be a

---

**31.** This result, admittedly, is somewhat novel in at least two ways. The separation of client status between the successive bankruptcy estates may be unprecedented as a holding, however fact-bound its genesis. Too, motions for disqualification under this theory are ordinarily and most properly brought by the former client in question, *Bieter Co. v. Blomquist*, 132 F.R.D. at 224, and not by an opponent in the litigation. F&W, however, did not challenge the Defendants' standing to raise this theory. And, in the last instance, the sensitivity of the backdrop should overcome any fussiness on these tangential aspects. Promoting the integrity of a trustee's fiduciary status is just that important:

> A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions.

*Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928) (Cardozo, J.).

material fact witness at trial. MINN.R.PROF. COND. 3.7(a) states:

A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:

(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) disqualification of the lawyer would work substantial hardship on the client.

It is crystal-clear that Wallrich is a necessary witness on the issues of breach of the Debtor's plan and causation of its damages, because of the relevance of the alleged events just described.[32] The issue as to which he would testify is squarely in contest—indeed, the point was joined by his response, after the Defendants raised it through Crowley's declaration. It has nothing to do with the nature or value of the services he rendered to the Debtor pre- or post-reorganization.

Finally, there is just no record to support the argument that disqualifying F&W would work a substantial hardship on the Chapter 7 estate. F&W defends its utility to the estate on the ground that both Fafinski and Wallrich have an intimate and manifold knowledge of the relevant facts.[33] It also complains that the estate may have to forgo the prosecution of this matter were it disqualified; it cites the alleged complexity of the facts, the estate's lack of means to fund the litigation through successor counsel, and the asserted prospect that no other law firm would undertake the financial risk of the engagement.

The record, however, does not bear out any of these points. As the length of this order suggests, the facts may not be simple—but neither are they incapable of mastery with some reasonable attention. There is no showing that the Plaintiff even tried to enlist other counsel before suing this out, and certainly no proof that another law firm could not or would not take over the litiga-

tion now. One cannot conclude that disqualifying F&W would impose substantial hardship on the estate.

The inherent conflict of credibility between Wallrich's status as advocate and his status as witness, then, is a fourth reason to disqualify his firm.

### CONCLUSION

For the four reasons just recited,

IT IS HEREBY DETERMINED AND ORDERED:

1. Fafinski & Wallrich, P.A., is disqualified from serving as special counsel to the Plaintiff under 11 U.S.C. § 327(e), FED. R.BANKR.P. 2014(a), and MINN.R.PROF.COND. 1.9 and 3.7.

2. Fafinski & Wallrich, P.A., and its attorneys are removed as counsel for the Plaintiff for this adversary proceeding.

---

32. Because the accusation that makes counsel a witness comes directly from the fact statement of a party-opponent, the prospect of a strategically-driven disqualification motion is more salient on this theory than on the other three. The veneer

of credibility on Crowley's version of events, however, is sufficient to outweigh the concern.

33. Somehow, it escapes counsel that the intimacy is itself the problem, in more ways than one.