176 F.3d 610
 In re AROCHEM CORPORATION, Debtor.
Bank Brussels Lambert, Banque Indosuez, Chase Manhattan
Bank, N.A., Swiss Bank Corporation, Victory Holding Company,
Crail Fund, Skopbank, Eric Johnson, Sherry L. Hutchison, The
Estate of Robert Johnson, and Victory Oil Company, Appellants,
v.
Richard M. COAN, Trustee, Appellee.
 Docket No. 98-5009.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 23, 1998.
Decided May 18, 1999.
 
 Richard C. Tufaro, Washington, D.C. (Milbank, Tweed, Hadley & McCloy, Washington, D.C., of counsel), for Appellants The Chase Manhattan Bank, Banque Indosuez and Swiss Bank Corporation.
 Andrew J. Frackman, O'Melveny & Myers, New York City, for Appellants Victory Oil Co., Victory Holding Co., Crail Fund, Eric C. Johnson, Sherry L. Hutchison and the Estate of Robert Johnson.
 William S. Fish, Jr., Tyler, Cooper & Alcorn, Hartford, CT, for Appellants Bank Brussels Lambert and Skopbank.
 Jerry J. Strochlic, Gibson, Dunn & Crutcher, New York City, of counsel, for Appellants.
 Michael A. Caddell, Houston, TX (Caddell & Chapman, Houston, TX, Timothy D. Miltenberger, Coan, Lewendon, Royston & Gulliver, New Haven, CT, of counsel), for Appellee.
 Before: MESKILL, LEVAL and STRAUB, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 Appeal from an order of the United States District Court for the District of Connecticut, Eginton, J., affirming an order of the United States Bankruptcy Court for the District of Connecticut, Shiff, C.B. J., authorizing the appellee trustee's retention of counsel to pursue lawsuits against creditors on behalf of the debtors' estates.
 
 
 2
 Affirmed.
 
 BACKGROUND
 
 3
 This dispute grows out of the bankruptcy of AroChem Corporation and AroChem International, Inc. (collectively "AroChem" or the "Estates"), Delaware corporations formed in 1988 to engage in the petrochemical and petroleum business. The Trustee for the bankrupt Estates, appellee Richard M. Coan (Trustee), sought authority to employ the law firm of Caddell & Conwell ("Caddell" or "Caddell Firm") to pursue litigation, on the Estates' behalf, against various creditors and shareholders of AroChem. Appellants, named defendants in the Trustee's lawsuit who object to the retention of Caddell, consist of two groups of AroChem's biggest creditors: the "Bank Group,"[1] comprising banks that lent money to AroChem, and the "Victory Group,"[2] comprising, for the most part, investment bankers who consulted on the creation of AroChem. Two nonparties, William R. Harris (Harris) and Edwin E. Wells (Wells), occupy central roles in the AroChem story, which is discussed briefly below.
 
 
 4
 In 1987 Wells assisted Harris in obtaining from the Victory Group financing needed to form AroChem. In return, Wells and Victory received a portion of AroChem's common stock and seats on its six-member board of directors. Harris maintained a sixty percent interest in AroChem and served as its president, chief executive officer and director. The Bank Group became involved when its members entered into a revolving credit agreement with AroChem in 1990, under which AroChem could borrow up to $245 million as needed for its business operations.
 
 
 5
 From the beginning of their relationship, Harris, Wells and the Victory Group disagreed about the operation and management of AroChem. Moreover, from 1989 forward, Wells accused Harris of serious wrongdoing at AroChem and of inflicting serious harm on the company. To that end he wrote letters to members of the Bank Group, before they executed the revolving credit agreement, warning them that Harris was engaging in unauthorized speculative oil trading with AroChem money and that criminal investigative authorities had been notified.
 
 
 6
 In 1991 the Bank Group discovered that AroChem's assets and net worth had been grossly overstated. In 1992, after an investigation confirmed that AroChem's senior management (including Harris) had engaged in widespread fraud, the Bank Group forced AroChem into involuntary bankruptcy under Chapter 11. The consolidated cases were later converted to Chapter 7 proceedings and Coan was appointed Trustee in August 1992. By the time the fraudulent scheme was uncovered and AroChem was placed in bankruptcy, the banks had lost in excess of $190 million.
 
 
 7
 In 1992 Harris was convicted of a variety of financial crimes growing out of his activity at AroChem, and he is now serving a 188 month term of imprisonment. United States v. Harris, 805 F.Supp. 166, 168 (S.D.N.Y.1992).
 
 
 8
 Prolific litigation evidences the discord among the players in the AroChem saga. The first lawsuit arose when the shareholder disputes over AroChem's management led Victory to elect to sell its shares. Victory proposed to sell its shares to Wells, who had a right of first refusal under the shareholder agreement. When no agreement was reached, however, Victory attempted to sell its shares to Harris. Wells objected, leading Victory to seek a judicial declaration that Victory was free to sell its shares to Harris. Victory Holding Co. v. Stetson Capital Corp., No. 89-2334 (Apr. 23, 1989) (C.D.Cal.) (Victory Action). Wells asserted counterclaims seeking to compel Victory to sell the shares to him.
 
 
 9
 In July 1989, while the Victory Action was pending, Harris sued Wells and the Victory Group in the District of Connecticut, accusing Wells of failing to perform his duties as an investment advisor to AroChem and of harming Harris and AroChem by making false accusations. Harris v. Wells, No. B 89-391 (D.Conn.) (Harris Action). The following month, Wells brought suit in the District of Connecticut against Harris, other board members and AroChem. Wells v. Harris, No. B 89-482 (D.Conn.) (Wells Connecticut Action). Wells alleged that through certain shareholder agreements Harris had caused Wells to lose his equity interest in AroChem, and that Harris was engaging in speculative trading and other activities that were harming Wells and AroChem. In 1990 Harris and Wells each amended their complaints to assert derivative claims on behalf of AroChem and to name additional defendants. The Victory Action, the Harris Action and the Wells Connecticut Action were then consolidated for pretrial purposes before Judge Eginton and the parties filed several counterclaims and cross-claims.
 
 
 10
 In the spring of 1994, Wells and his corporations retained Caddell, who, on Wells' behalf, brought an action in Texas state court against over fifty defendants, including Harris, the Bank Group and the Victory Group. Wells v. Chase Manhattan Bank, N. A., No. 94-35500 (Dist. Ct., Harris Cty. Tex.) (filed July 19, 1994) (Wells Texas Action).
 
 
 11
 Between 1992 and 1994, the Trustee liquidated the physical assets of AroChem--primarily its oil refining facilities located in Puerto Rico--and became familiar with AroChem's history. In the summer of 1994, the Trustee began efforts to liquidate AroChem's only remaining assets: its causes of action. In addition to examining derivative causes of action brought by Harris against Wells and Wells against Harris, which the Trustee inherited when the AroChem Chapter 7 petition was filed, the Trustee investigated allegations by Wells that the Bank Group and others were active participants in the wrongdoing at AroChem. This allegation was evidenced by the Bank Group's lending more than $100 million to AroChem despite its awareness of allegations that Harris was engaging in criminal activity there.
 
 
 12
 In this endeavor, the Trustee instructed general counsel for the AroChem Estates, Coan, Lewendon, Royston & Gulliver, LLC (Coan, Lewendon), to investigate the Estates' potential claims. To this end, Coan, Lewendon reviewed internal records of AroChem as well as accounting records prepared by an independent auditor following the discovery of wrongdoing in 1990, consulted with a forensic accountant about the viability of claims against the Bank Group and the Victory Group, discussed with counsel for Victory the validity of the Victory Group's claims against Wells and others, discussed with counsel for the Bank Group the validity of the Bank Group's claims against Wells and the Victory Group, and discussed with Caddell claims against Wells, the Bank Group, Victory Group and others. Ultimately, counsel analyzed the relative merits of the AroChem Estates' causes of action and presented its recommendations to the Trustee. Counsel's investigation consumed between 150 and 200 hours of attorney time in the summer of 1994.
 
 
 13
 As a result of the investigation, the Trustee concluded that he should pursue claims against the Victory Group and the Bank Group, as well as other wrongdoers, including Harris, AroChem's accountants, Ernst & Young and AroChem's attorneys, Whitman & Ransom. The Trustee also concluded that although he should not pursue claims against Wells, he should retain the option to do so.
 
 
 14
 The Trustee also concluded that he would need to retain counsel to bring the Estates' claims against the Bank Group and the Victory Group. Because the Estates had no unencumbered funds, the Trustee was forced to secure counsel willing to represent the Estates in this matter on a contingency fee basis and thereby incur substantial costs.
 
 
 15
 To that end, both the Trustee and Wells searched for lawyers to represent the Estates. Despite discussions with a number of firms in Massachusetts, Connecticut and New York, the Trustee ultimately "after due diligence, found no ... qualified firm willing to undertake representation of the Estate on terms even remotely as favorable to the Estate." In re AroChem Corp., 181 B.R. 693, 697 (Bankr.D.Conn.1995).
 
 
 16
 Shortly thereafter, the Trustee met with Wells and representatives of the Caddell Firm, which had just recently filed the Wells Texas Action on Wells' behalf. In no small part because of its familiarity with the case, Caddell offered to represent the Estates in their claims against the Bank Group and Victory Group on a contingency fee basis. Thereafter the Trustee retained Caddell to file a federal action in the Southern District of Texas. Coan v. Chase Manhattan Bank, N.A., No. H-94-3930 (Trustee's Texas Action). The Trustee's Texas Action made factual allegations virtually identical to those alleged in the Wells Texas Action and named more than thirty of the same defendants. Both actions alleged that members of the Bank Group fraudulently or negligently facilitated AroChem's demise by lending AroChem millions of dollars in 1990 despite awareness of the criminal activity in which Harris was engaged at AroChem.
 
 
 17
 Because 11 U.S.C. § 327 mandates bankruptcy court approval of a trustee's employment of professionals, the Trustee moved the bankruptcy court for permission to retain Caddell. The scope of the proposed retention was limited to representing the Estates in the Trustee's Texas Action, five adversary proceedings and the derivative claims in the Wells Connecticut Action. Aware that Caddell would be pressing similar claims on behalf of both Wells and the Estates, and that the prospect for competing recoveries could lead Caddell into a conflict of interest, the Trustee asked the court to approve an agreement whereby Wells and the Trustee would "pool" their respective claims and share recoveries on a roughly equal basis (Pooling Agreement).
 
 
 18
 Appellants, AroChem creditors named as defendants in both the Trustee's Texas Action and the Wells Texas Action, objected to the proposed retention, arguing that the Bankruptcy Code prohibited Caddell from representing the Estates. Appellants contended that Caddell had a conflict of interest because it represented Wells, who is (1) an unsecured creditor holding three proofs of claim against the Estates, (2) a plaintiff in lawsuits against numerous co-creditors, (3) a defendant in derivative claims brought by Harris on the Estates' behalf, and (4) a potential target of other claims that could be brought by the Estates. Appellants complained that Caddell unfairly persuaded the Trustee to sue Wells' adversaries, that retention of Caddell would preclude the Trustee from pursuing claims against Wells, and that retention of Cadell would force Wells and the Estates to compete for recoveries. These conflicts, appellants maintained, demonstrated that Caddell ran afoul of section 327(a) of the Bankruptcy Code, which governs a trustee's employment of professionals, because Caddell held and represented interests adverse to the Estates and, moreover, was not a "disinterested person." The overarching theme of appellants' objection is that Wells and his corporations hijacked the Trustee--and the attendant resources of the bankruptcy estate--to advance Wells' personal agenda against the appellants.
 
 
 19
 After a hearing, the bankruptcy court conditionally authorized the retention, pending approval of the Pooling Agreement. The bankruptcy judge analyzed the application in the context of four questions: whether Wells had claims against the Estates, whether the Trustee had claims against Wells, whether Caddell's representation of Wells might weaken any claims the Trustee might have against Wells, and whether the potential for competition between Wells and the Trustee for recoveries and the resources of Caddell would create a conflict precluding Caddell from jointly prosecuting both actions. In re AroChem Corp., 181 B.R. at 700-01.
 
 
 20
 As to the first question, the bankruptcy court concluded that Wells' claims against the Estates did not create a disqualifying adverse interest. In particular, Wells' proofs of claim were not relevant to the subject matter of the Trustee's Texas Action and, moreover, Caddell had agreed to discontinue representing Wells if the Trustee objected to the proofs of claim. Id. at 701. As to Wells' derivative claims, the bankruptcy court noted that they, too, were not within the scope of Caddell's limited employment and, moreover, that Wells had filed a motion to dismiss those derivative claims. Id.
 
 
 21
 As to the Trustee's claims against Wells, the bankruptcy court first addressed the Bank Group's[3] contention that Wells might be liable on a breach of fiduciary duty theory based on actions he took during an unsuccessful attempt to seize control of AroChem. Id. at 702. In particular, Wells is alleged to have divulged confidential communications of the AroChem board of directors during negotiations with a third-party; the Trustee's view was that Wells was a "whistle-blower" trying to save AroChem from Harris and the Victory Group. Id.
 
 
 22
 As to this claim the bankruptcy court credited the Trustee's conclusion, made "after exploring, as best he could, the complex, extensive, and sometimes obscure web of claims and counterclaims surrounding the collapse of the AroChem financial interests," that the Estates were best served by working with Wells against the Bank Group. Id. The court also credited the Trustee's judgment that he had "to either join Wells or litigate against him since he is convinced that he cannot successfully prosecute the Trustee's Texas Action without Wells' full cooperation." Id. Finally, the court noted that the Trustee had preserved claims against Wells out of "an abundance of caution," and that Caddell would not represent the Estates in any suits later brought against Wells. Id.
 
 
 23
 The bankruptcy court also concluded that there was no reasonable danger that Caddell's past representation of Wells would weaken any claims the Trustee might have against Wells. Id. at 702-03. On this score the court noted that throughout three days of hearings the "Bank Group did not call any witnesses other than Wells and the Trustee to offer any testimony of any potential claim by the Trustee against Wells that might arise out of the Trustee's Texas Action." Id. The bankruptcy judge concluded that neither the testimony of Wells and the Trustee "nor any other evidence persuades me that there is any reasonable probability of any such [potential claim]," and that "[t]here is nothing ... but raw speculation to support a claim that a conflict might develop." Id. at 703. Further, the bankruptcy court noted that Caddell would withdraw from representing Wells in the event any conflict arose.
 
 
 24
 Finally, the bankruptcy court noted the potential that "the prosecution of Wells' claim would undermine the vitality of the Trustee's claim against a common defendant," which arguably could divide Caddell's loyalty. Id. However, the court credited the Trustee's testimony that although there was a theoretical possibility that the development of facts in the Wells suit might favor judgments in favor of Wells at the Estates' expense, the Trustee knew of no present conflict in that regard and, perhaps most important, did not believe the claims of Wells and the Trustee to be mutually exclusive. Moreover, to the extent the claims were mutually exclusive, the Pooling Agreement would cure the potential for conflict. Id.
 
 
 25
 Indeed, the bankruptcy court was "persuaded by the Trustee's testimony" that the Trustee and Wells would not compete for recoveries. To that end, the court concluded:
 
 
 26
 It is apparent that with respect to the Trustee's Texas Action, there is an identity, rather than a conflict, of interest. Caddell has an incentive to vigorously pursue the Wells and the Trustee claims against their common adversaries. By contrast, the Bank Group, whose members are included in those adversary ranks, has an interest in thwarting that action.
 
 
 27
 Id. Stating the "overarching purpose served by § 327 is the maximization of the bankruptcy estate," the bankruptcy court concluded that the representation was in the best interest of the estate and approved the application, subject to approval of the Pooling Agreement. Id.
 
 
 28
 At the bankruptcy court's urging, the parties attempted to resolve the Pooling Agreement issue before a private dispute resolution service and a mediator. When those efforts failed, the Trustee filed a modified retention application which, among other things, eliminated the Pooling Agreement and provided that Caddell would terminate its representation of Wells in any AroChem related matters, except to the extent approved by the court. Although the Bank Group and the Victory Group maintained their objections, the bankruptcy court approved the revised arrangement without opinion.
 
 
 29
 The Bank Group and Victory Group then appealed to the district court. While that appeal was pending, Caddell terminated its representation of Wells entirely, confining its relationship with Wells to an agreement to pay any fees that his successor counsel might incur litigating appeals from dismissed claims. The Bank Group and the Victory Group continued to object, arguing that even though Caddell had terminated its representation of Wells, Caddell's prior representation barred its employment under the Code. In an unpublished opinion and order, the district court rejected appellants' arguments and affirmed the bankruptcy court's retention order. This timely appeal followed.
 
 I. Jurisdiction
 
 30
 As an initial matter, the Trustee challenges our jurisdiction over this appeal. As explained below, our recent decision in In re Palm Coast, Matanza Shores Ltd. Partnership, 101 F.3d 253, 256 (2d Cir.1996), requires that we hear this appeal.
 
 
 31
 Appeals from cases originating in the bankruptcy courts are governed by 28 U.S.C. § 158. Section 158(a) vests district courts with appellate jurisdiction over bankruptcy court rulings. While final orders of the bankruptcy court may be appealed to the district court as of right, see 28 U.S.C. § 158(a)(1), appeals from nonfinal bankruptcy court orders may be taken only "with leave" of the district court, see id. § 158(a)(3).
 
 
 32
 Orders issued by the district courts acting in their bankruptcy appellate capacity may in turn be appealed to the courts of appeals under three circumstances. First, section 158(d) vests the courts of appeals with jurisdiction over appeals from all "final decisions, judgments, orders, and decrees" of the district court. 28 U.S.C. § 158(d). This "final order" requirement is similar to the general grant of appellate jurisdiction found at 28 U.S.C. § 1291, which vests courts of appeals with jurisdiction over "appeals from all final decisions of the district courts of the United States." 28 U.S.C. § 1291. Second, the doctrine enunciated in Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), allows appeal from certain "collateral" orders if they " conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and [3 are] effectively unreviewable on appeal from a final judgment." Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 375, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981) (citation and internal quotation marks omitted). Finally, 28 U.S.C. § 1292(b) gives us discretionary jurisdiction over appropriately certified interlocutory orders. See Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). As the district court has not certified this appeal under section 1292(b), we will have jurisdiction only if either (1) the district court's order was final, and hence appealable under section 158(d), or (2) the district court's order was interlocutory but appealable under Cohen.[4]
 
 A. Finality Requirements
 
 33
 Many courts have noted that although section 158(d) limits courts of appeals' jurisdiction to appeals from "final" orders, "the concept of 'finality' is more flexible in the bankruptcy context than in ordinary civil litigation." Palm Coast, 101 F.3d at 256 (citing In re Prudential Lines, 59 F.3d 327, 331 (2d Cir.1995)); see In re Devlieg, Inc., 56 F.3d 32, 33 (7th Cir.1995) (per curiam) ("[M]yriad are the cases which say that finality is to be interpreted more liberally in bankruptcy cases.").
 
 
 34
 Properly understood, the relaxed approach to finality in bankruptcy cases is appropriate "[b]ecause bankruptcy proceedings often continue for long periods of time, and discrete claims are often resolved at various times over the course of the proceedings." In re Chateaugay Corp., 880 F.2d 1509, 1511 (2d Cir.1989). This "pragmatic approach to finality" does "not overcome the general aversion to piecemeal appeals," however. In re Chateaugay Corp., 922 F.2d 86, 90 (2d Cir.1990). We merely seek to avoid a situation where an otherwise "final" order--e. g., an order resolving all of the claims asserted within a discrete adversary proceeding--is rendered "nonfinal" simply because it arises in the context of a bankruptcy proceeding.
 
 
 35
 B. Were the Orders Below "Final"?
 
 
 36
 In the non-bankruptcy cases, orders granting or denying motions to disqualify counsel are not considered "final" and are not immediately appealable. Richardson-Merrell, Inc. v. Koller, 472 U.S. 424, 440, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985); Firestone, 449 U.S. at 379, 101 S.Ct. 669. Not surprisingly, then, the majority of appeals courts conclude that district court orders reviewing bankruptcy court retention decisions are not "final" orders. See, e. g., Firstmark, 46 F.3d at 657-59 (dismissing appeal from district court order affirming bankruptcy court order refusing to disqualify counsel under 11 U.S.C. § 327(a)); In re Westwood Shake & Shingle, 971 F.2d 387, 389 (9th Cir.1992) (dismissing appeal from district court order affirming bankruptcy court's appointment of special counsel to debtor's trustee); In re Delta Servs. Indus., 782 F.2d 1267, 1272 (5th Cir.1986) (discerning "no basis for granting greater appealability to orders denying motions to disqualify counsel in bankruptcy cases than to those in ordinary civil cases"); In re Continental Inv. Corp., 637 F.2d 1, 4 (1st Cir.1980) (order denying motion to disqualify counsel not final).
 
 
 37
 At least two circuits hold to the contrary. See In re BH & P, Inc., 949 F.2d 1300, 1306-07 (3d Cir.1991); F/S Airlease II, Inc. v. Simon, 844 F.2d 99, 103-05 (3d Cir.1988); Committee of Dalkon Shield Claimants v. A.H. Robins Co., 828 F.2d 239, 241 (4th Cir.1987). The Third Circuit employs a three-part test to determine whether district courts' appellate orders in bankruptcy cases are appealable, looking to "the impact of the matter on the assets of the bankruptcy estate, the preclusive effect of a decision on the merits, and whether the interests of judicial economy will be furthered." F/S Airlease, 844 F.2d at 104. Courts applying those standards have concluded that district court orders reviewing bankruptcy court decisions on conflict issues often are effectively "final" and are properly appealable under section 158(d). See e. g., In re B H & P, Inc., 949 F.2d at 1307; F/S Airlease, 844 F.2d at 103.
 
 
 38
 In this Circuit our inquiry begins and ends with Palm Coast. In Palm Coast, the bankruptcy court authorized a trustee to retain his own real estate firm as a consultant to the estate under 11 U.S.C. § 327. 101 F.3d at 255. After the district court affirmed the bankruptcy court decision, and the objector appealed, we took jurisdiction and reversed. In addressing jurisdiction, we noted the more flexible standard of finality that applies in bankruptcy cases, noting that orders in bankruptcy cases " 'may be immediately appealed if they finally dispose of discrete disputes within the larger case.' " Id. at 256 (quoting In re Johns-Manville Corp., 920 F.2d 121, 126 (2d Cir.1990)).
 
 
 39
 The court then followed the inquiry outlined in Bowers v. Connecticut Nat'l Bank, 847 F.2d 1019, 1022 (2d Cir.1988): " 'First, we must determine whether the underlying decision of the bankruptcy court was final or interlocutory.... If the decision [of the bankruptcy court] was final, we must then ask whether the district court's disposition independently rendered the matter nonappealable.' " Palm Coast, 101 F.3d at 256 (quoting Bowers, 847 F.2d at 1022) (alteration in original).
 
 
 40
 Applying this test, the panel first concluded that the underlying order of the bankruptcy court was final, because "[n]othing in the order of the bankruptcy court or its affirmance by the district court indicates any anticipation that the decision will be reconsidered." Id. The panel also cited the district court's conclusion that the bankruptcy court order was a "final order." Id. The court further noted that the district court's disposition did not render the matter non-appealable because rather than "direct[ing] further proceedings in the bankruptcy court," the district court merely "affirmed the bankruptcy court's final order." Id. The court concluded that "[b]ecause the issue of whether [appellee] can hire his real estate firm was finally decided, the district court's order is appealable under subsection 158(d)." Id.
 
 
 41
 Because, as in Palm Coast this case involves the denial of a disqualification motion under 11 U.S.C. 327(a), we apply Palm Coast 's reasoning to the orders issued by the bankruptcy and district courts in this case and conclude that they are indeed "final."[5] For one, neither the bankruptcy court nor the district court suggested that its order would be reconsidered. Further, as in Palm Coast, the district court specifically held that the bankruptcy court's order was final. Finally, as in Palm Coast, the district court did not order any further proceedings in the bankruptcy court. Under this standard, we must hear this appeal.[6]
 
 II. The Merits
 
 42
 In an appeal from a district court's review of a bankruptcy court decision, we review the bankruptcy court decision independently, accepting its factual findings unless clearly erroneous but reviewing its conclusions of law de novo. In re McLean Industries, 30 F.3d 385, 387 (2d Cir.1994).
 
 
 43
 A. Employment of Professionals Under the Bankruptcy Code: 11 U.S.C. § 327
 
 
 44
 Subject to certain restrictions which lie at the heart of this appeal, the trustee of a bankruptcy estate may, subject to bankruptcy court approval, employ professionals "to represent or assist the trustee in carrying out the trustee's duties" under the Bankruptcy Code. 11 U.S.C. § 327(a). The statute governing the trustee's ability to retain professionals is 11 U.S.C. § 327, three subsections of which are relevant here.
 
 
 45
 Subsection (a) sets out a general, two-part test governing employment of all professionals. Under subsection (a), the trustee may hire only those professionals that (1) "do not hold or represent an interest adverse to the estate," and (2) are "disinterested persons." 11 U.S.C. § 327(a).
 
 
 46
 Limited exceptions to this broad prohibition are found in subsections (c) and (e). Subsection (c) provides that a person is "not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest." 11 U.S.C. § 327(c). This provision prevents disqualification based solely on the professional's prior representation of or employment by a creditor--it "does not preempt the more basic requirements of subsection (a)." In re Interwest Business Equip., 23 F.3d 311, 316 (10th Cir.1994). Thus it "remains important to determine whether the person is disqualified on any other ground, e. g., an interest adverse to the estate." 3 Lawrence P. King, et al., Collier on Bankruptcy, p 327.04[b], at 327-56 (15th ed. rev.1998).
 
 Section 327(e) provides:
 
 47
 The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.
 
 
 48
 11 U.S.C. § 327(e).
 
 
 49
 By regulating the trustee's ability to hire professionals, section 327 " 'serve[s] the important policy of ensuring that all professionals appointed [to represent the trustee] tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities.' " In re Leslie Fay Companies, 175 B.R. 525, 532 (Bankr.S.D.N.Y.1994) (quoting Rome v. Braunstein, 19 F.3d 54, 58 (1st Cir.1994)).
 
 
 50
 When evaluating proposed retention, a bankruptcy court "should exercise its discretionary powers over the approval of professionals in a manner which takes into account the particular facts and circumstances surrounding each case and the proposed retention before making a decision." 3 Collier, p 327.04[a] (citing In re Harold & Williams Dev. Co., 977 F.2d 906, 910 (4th Cir.1992) ("[T]he discretion of the bankruptcy court must be exercised in a way that it believes best serves the objectives of the bankruptcy system. Among the ultimate considerations for the bankruptcy courts in making these decisions must be the protection of the interests of the bankruptcy estate and its creditors, and the efficient, expeditious, and economical resolution of the bankruptcy proceeding.")).
 
 
 51
 Appellants argue that Caddell runs afoul of section 327 because, by virtue of its representation of Wells, a creditor who is embroiled in litigation against other creditors and is a defendant in derivative claims brought on the Estates' behalf, Caddell (1) holds or represents an interest adverse to the estate, and (2) is not a "disinterested person." In essence, appellants argue that a trustee may not retain special counsel that has represented one creditor in a suit against another creditor, where the purpose of the retention is to pursue related litigation against the second creditor. Although section 327 might bar such representation under some circumstances, for the reasons explained below we do not believe that it erects a per se ban on such representation or that, in fact, it bars the retention at issue here.
 
 
 52
 B. Distinction Between General and Special Counsel
 
 
 53
 As an initial matter, the Trustee contends that because Caddell was hired as "special" counsel for the limited purpose of pressing the Trustee's Texas Action, rather than as general counsel to handle the entire bankruptcy proceeding, any potential conflicts must be evaluated only with respect to the scope of Caddell's proposed retention. We agree.
 
 
 54
 When the bankruptcy court addressed this issue, it turned directly to subsection 327(e), which permits the trustee to hire, for a "specified special purpose," an attorney who previously represented the debtor, as long as the attorney does not hold or represent an interest adverse to the estate "with respect to the matter on which such attorney is to be employed." 11 U.S.C. § 327(e). After noting that subsection (e) was the only section to address retention of special counsel, the bankruptcy court held that Congress intended, but failed, specifically to include within section 327(e) attorneys that represented creditors, in addition to those who represented the debtor. Accordingly, although explaining that the retention was proper under sections 327(a) and (c), the bankruptcy court purported to apply section 327(e) to the retention issue before it. While this result--which limits conflict inquiry to the scope of proposed counsel's retention--is correct, the bankruptcy court's reasoning is not. By its terms, section 327(e) applies only where the attorney represented the debtor. Because Caddell never has represented the debtor, section 327(e) itself does not apply in this case and we must analyze the proposed retention under sections 327(a) and (c).
 
 
 55
 We nonetheless believe, in accordance with a number of other courts, that in applying sections 327(a) and (c) we should reason by analogy to 327(e), so that "where the trustee seeks to appoint counsel only as 'special counsel' for a specific matter, there need only be no conflict between the trustee and counsel's creditor client with respect to the specific matter itself." Stoumbos v. Kilimnik, 988 F.2d 949, 964 (9th Cir.1993). Like the court in In re Fondiller, 15 B.R. 890, 892 (B.A.P. 9th Cir.1981), we "interpret that part of § 327(a) which reads that attorneys for the trustee may 'not hold or represent an interest adverse to the estate' to mean that the attorney must not represent an adverse interest relating to the services which are to be performed by that attorney." Id.
 
 
 56
 Thus, where the interest of the special counsel and the interest of the estate are identical with respect to the matter for which special counsel is retained, there is no conflict and the representation can stand. See, e. g., In re National Trade Corp., 28 B.R. 872, 875 (Bankr.N.D.Ill.1983) (denying motion to disqualify special counsel under § 327(c) because interest of the firm as special counsel was identical to interest of the estate); In re RPC Corp., 114 B.R. 116 (M.D.N.C.1990) (approving retention because " 'the interests of the estate and the firm's clients are identical with respect to the firm's duties as special counsel' ") (quoting Fondiller, 15 B.R. at 892). Accordingly, in this case we must ask whether--with respect to the special representation it has been hired to undertake--Caddell (1) holds or represents an interest that is adverse to the estate, and (2) is a "disinterested person."
 
 C. "Adverse Interests" Under Section 327(a)
 
 57
 The concept of "adverse interests" appears twice in section 327(a). First, the statute provides that counsel may "not hold or represent an interest adverse to the estate;" second, counsel must be a "disinterested person," which means that counsel may not, among other things, "have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders." 11 U.S.C. § 101(14)(E).
 
 
 58
 The Bankruptcy Code does not define the phrase "hold or represent an interest adverse to the estate." Many courts employ the definition of In re Roberts, 46 B.R. 815 (Bankr.D.Utah 1985), aff'd in relevant part and rev'd and remanded in part on other grounds, 75 B.R. 402 (D.Utah 1987):
 
 
 59
 (1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.
 
 
 60
 Id. at 827. See In re Crivello, 134 F.3d 831, 835 (7th Cir.1998) (adopting Roberts definition); In re Caldor, 193 B.R. 165, 171 (Bankr.S.D.N.Y.1996). Whether an adverse interest exists is best determined on a case-by-case basis. Caldor, 193 B.R. at 172 (citing In re BH & P, 949 F.2d at 1315-16).
 
 
 61
 1. Does Caddell "Hold" an Interest Adverse to the Estates?
 
 
 62
 Appellants have not produced any evidence to indicate that the Caddell Firm personally "holds" any interests adverse to the Estates. It is not a pre-petition creditor of the Estates, nor does it otherwise personally possess any claims or interests contrary to the Estates. Accordingly, this ground does not serve as a basis for disqualification.
 
 
 63
 2. Does Caddell "Represent" an Interest Adverse to the Estates?
 
 
 64
 When the bankruptcy court approved the retention, the Caddell Firm still represented Wells in all of his AroChem related litigation, which included Wells' claims against the Estates and derivative claims brought by Harris against Wells on the Estates' behalf. In evaluating the retention question the bankruptcy court accepted Caddell's representations that it would terminate its representation of Wells in the event that any potential conflicts were found or were later to arise. Because Caddell since has terminated all representation of Wells, the question now is whether Caddell's prior representation of Wells establishes that Caddell "represents" an interest adverse to the Estates with respect to the subject matter of Caddell's retention.
 
 
 65
 At the outset, we note that section 327(a) is phrased in the present tense, permitting representation by professionals "that do not hold or represent an interest adverse to the estate," and limiting the class of acceptable counsel to those "that are disinterested persons." 11 U.S.C. § 327(a) (emphasis added). "Congress' use of a verb tense is significant in construing statutes." United States v. Wilson, 503 U.S. 329, 333, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992); see Otte v. United States, 419 U.S. 43, 49-50, 95 S.Ct. 247, 42 L.Ed.2d 212 (1974) (interpreting provision of Internal Revenue Code and according significance to Congress' use of both past and present tenses). Thus, counsel will be disqualified under section 327(a) only if it presently "hold[s] or represent[s] an interest adverse to the estate," notwithstanding any interests it may have held or represented in the past. Because Caddell has terminated its representation of Wells, it no longer represents Wells' interests and therefore survives the first half of the section 327(a) test.
 
 
 66
 This reasoning finds support in related portions of the Bankruptcy Code, which draw explicit distinctions between current and past relationships. For example, the Bankruptcy Code defines a "disinterested person" as a person that, among other things, "is not and was not an investment banker for any outstanding security of the debtor," see 11 U.S.C. § 101(14)(B) (emphasis added); "has not been, within three years before the date of the filing of the petition, an investment banker for a security of the debtor, or an attorney for such an investment banker in connection with the offer, sale, or issuance of a security of the debtor," id. § 101(14)(C) (emphasis added); and "is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor," id. § 101(14)(D) (emphasis added). The Bankruptcy Code thus recognizes a distinction between past and present representation. Because Caddell no longer "represents" Wells, Caddell does not represent any of Wells' interests, whether or not any of those interests might be adverse to the estate. Accordingly, Caddell does not represent any interests adverse to the Estates within the meaning of section 327(a) based on its prior representation of Wells.
 
 
 67
 Nonetheless, even if section 327(a) did reach past, as well as present representation, Caddell would still not run afoul of the provision, as demonstrated below.
 
 
 68
 D. Assuming Section 327(a) Covers Past Representation, Does Caddell Represent An Interest Adverse to the Estates?
 
 
 69
 To evaluate this claim, we must inquire whether Wells' interests are adverse to the Estates with regard to the Trustee's Texas Action.
 
 
 70
 1. Caddell's Representation of Wells in his Capacity as a Creditor
 
 
 71
 Wells is a creditor of AroChem with three proofs of claim pending against the Estates. Although Caddell's past representation of Wells in connection with these claims might mean that Caddell "represented an interest adverse to the estate" within the meaning of 327(a), section 327(c) provides that an attorney will not be disqualified based solely on prior representation of a creditor, unless there is an actual conflict, in which case disqualification is mandatory. 11 U.S.C. § 327(c). Thus, putting aside for now whether other bases for disqualification exist, and keeping in mind the limited scope of Caddell's retention, see supra II.B., the bankruptcy court was obliged to disqualify Caddell based on its representation of Wells' creditor interests only if that representation created "an actual conflict of interest" with respect to matters within the scope of Caddell's limited retention.
 
 
 72
 The bankruptcy court concluded--and the appellants do not seriously dispute--that "any contest arising out of [Wells'] proofs of claim is outside the scope of the [sic] Caddell's specified special employment." In re AroChem Corp., 181 B.R. at 701. The record contains no evidence that Wells' proofs of claim are germane to the subject matter of the Trustee's Texas Action, or to any other possible aspect of Caddell's proposed employment. Because no conflict--actual or potential--arises from Caddell's past involvement with Wells' proofs of claim and its current prosecution of the Trustee's Texas Action, Caddell's representation of Wells in his creditor capacity does not serve as a basis for disqualification.
 
 
 73
 2. Caddell's Representation of Wells in His Capacity as a Target of Claims Made by the Estates
 
 
 74
 When the AroChem bankruptcy petition was filed, the Trustee succeeded to derivative claims in the Harris Action that accused Wells of failing to perform his duties as an investment advisor to AroChem and of making false accusations against Harris and AroChem. Additionally, the appellants maintain, the Estates have a breach of fiduciary duty claim against Wells based on disclosures of confidential information that he made during an unsuccessful attempt to seize control of AroChem. Appellants claim that as a result of these claims Wells holds an interest adverse to the estate and thus that Caddell "represents" an interest adverse to the estate and is barred from representing the Estates now. The bankruptcy and district courts, however, found that these claims do not create an adversity of interest between Wells and the Estates with respect to the matters involved in the Trustee's Texas Action. That finding is supported by the record, is not erroneous and will not be disturbed.
 
 
 75
 In particular, the Trustee testified that after investigation he concluded there were no viable claims against Wells. We note additionally that the derivative claims were not asserted by the Trustee on behalf of the Estates but rather by Harris, and have remained stagnant for years. The Trustee understandably did not wish to align himself with Harris, who was convicted of criminal wrongdoing that led to AroChem's demise.
 
 
 76
 Most important, however, appellants have failed to offer any evidence that any potential claims against Wells are relevant to the matters to be litigated in the Trustee's Texas Action, so as to create an interest that is adverse to the Estates with respect to that action.
 
 
 77
 In re Southern Kitchens, 216 B.R. 819 (Bankr.D.Minn.1998), relied on by appellants, demonstrates this point. In that case, the trustee attempted to retain counsel to pursue claims against a secured creditor and former director of the debtor. In its application, counsel failed to disclose that it previously had represented an individual, Gunberg, who was a former director and equity holder of the debtor and who had wrestled with the targets of the trustee's proposed suit for control of the company. Id. at 822, 830. Although the Trustee's proposed suit did not name Gunberg as a defendant, the defendants' version of the facts laid the blame for the company's demise at Gunberg's door. Id. at 828. Applying section 327(e) (counsel had, in fact, represented the debtor), the court rejected the application because counsel had, by virtue of its representation of Gunberg, represented interests that "were or are adverse to the bankruptcy estate 'with respect to' this adversary proceeding." Id. at 827-28. In particular, the court noted that section 327(e) bars retention of "special counsel who, on any matter of substance, represent or have represented a client that is an actual or potential opponent of the estate in the dispute for which counsel would be engaged." Id. at 826 (emphasis added).
 
 
 78
 Because the defendants "clearly [sought] to affix blame to [Gunberg in order] to defeat the Plaintiff's various claims," id. at 828, and because there was evidence in the record to support their defense, there was a legitimate chance that counsel's former client was the cause of the very harm the trustee complained of in the suit to be brought by counsel. Resolution of the matters in dispute "could produce a finding that Gunberg harmed the estate in the very sequence of events that is the basis of the estate's causes of action here," which would be enough to establish an adverse interest under section 327(e). Id.
 
 
 79
 The Southern Kitchens Court reflected that "courts must be sensitive to the possibility of strategic abuse of disqualification motions," id., and only found the conflict because the record manifested "a meritorious dispute over the reason for the reorganized Debtor's failure, in which a persisting struggle for control of a troubled company was a central incident," id. at 828-29. Accordingly, the court concluded, "[b]ecause of the possibility that its former client is liable for the damage that it attributes to the Defendants, [counsel] must be deemed to have represented an interest that is adverse to the estate on the subject matter of the suit it has brought on behalf of the estate." Id. at 829.
 
 
 80
 These findings lie in stark contrast to this case. Despite their generalized complaints, appellants present no evidence that Wells might be responsible for the injuries asserted in the Trustee's Texas Action. There is no evidence that proof of any claims the Estates might have against Wells would run counter to proof the Trustee would need to establish in order to succeed in the Trustee's Texas Action. To the contrary, as the bankruptcy court noted, throughout three days of hearings the "Bank Group did not call any witnesses other than Wells and the Trustee to offer any testimony of any potential claim by the Trustee against Wells that might arise out of the Trustee's Texas Action." In re AroChem Corp., 181 B.R. at 702-03. The bankruptcy judge then concluded, in a finding affirmed by the district court and consistent with the record, that neither the testimony of Wells and the Trustee "nor any other evidence persuades me that there is any reasonable probability of any such [potential claim]," and that "[t]here is nothing ... but raw speculation to support a claim that a conflict might develop." Id. at 703. Absent some evidence that Wells holds an interest adverse to the Estates with respect to the subject matter of the Trustee's Texas Action, there is no basis to disqualify Caddell under section 327(a) on the ground that it represents an interest adverse to the estate.
 
 
 81
 On a related point, appellants argue that the Estates have additional claims against Wells that will be lost if Caddell is allowed to represent the Trustee. This contention is not persuasive. As an initial matter, Caddell no longer represents Wells, so that firm will never be in the position of simultaneously suing and defending Wells, as appellants suggest. Moreover, as to the ability to pursue Wells, the Trustee acknowledges that Caddell will use Wells as its principal fact witness in the Trustee's Texas Action, and that, as a result, Wells' version of the facts will predominate. But the Trustee, on the advice of his general counsel, made a judgment that it was in the best interest of the Estates to sue the defendants named in the Trustee's Texas Action, and to that end align its interest with Wells. Moreover, in the unlikely event that the Trustee later chooses to pursue Wells--despite the dearth of record evidence to suggest that such claims exist--Caddell will not represent the Estates, and the Estates will be free to secure separate counsel to press the claims.
 
 
 82
 Appellants also rely on Meespierson, Inc. v. Strategic Telecom, 202 B.R. 845 (D.Del.1996). There the debtor sought permission to employ special counsel to pursue lender liability litigation against Meespierson, the debtor's placement agent. Id. at 846. Proposed counsel previously had given legal advice to Cahill, a shareholder and creditor of the debtor, advising that any lender liability claims that Cahill might want to advance were better asserted by the debtor. Id. at 847.
 
 
 83
 The district court reversed the bankruptcy court's authorization of the employment, concluding that counsel's prior representation of Cahill--a creditor--meant that Grant "represents an interest materially adverse to the interest of the estate" in violation of sections 101(14)(E) and 327(a). Id. at 848. Although the court cited and purported to accept In re Fondiller, 15 B.R. at 892, for the proposition that in applying sections 327(a) and (c) to special counsel the court must evaluate conflicts with respect to the scope of special counsel's employment, see Meespierson, 202 B.R. at 849, the Meespierson Court did not examine or explain how Cahill's interests were adverse to the debtor's with respect to the matter counsel was to prosecute.
 
 
 84
 Here, in contrast, the bankruptcy court examined the proposed retention and concluded that the interests of Caddell's (now former) client, Wells, were not adverse to the Estates with respect to the matter Caddell was hired to prosecute for the Estates. Meespierson sweeps too broadly, suggesting a per se ban whenever special counsel has previously represented a creditor. The statutory scheme does not dictate such a rule, however. Rather, given "the fact-specific nature of parties' interests and their alignments ... 'no general rule of simple application ... can be gleaned.' " Southern Kitchens, 216 B.R. at 826-27 (quoting In re Tidewater Mem. Hosp., 110 B.R. 221, 228 (Bankr.E.D.Va.1989)). Rather, each case "must finally turn on its own circumstances, based on a common-sense divination of adversity or commonality." Id. at 827.
 
 
 85
 We believe that In re RPC Corp., 114 B.R. 116 (M.D.N.C.1990), provides a closer analogy to this case. There, the Chapter 7 trustee determined that the bankruptcy estate's most valuable asset was its lender liability claim against a bank that had lent funds to RPC. The loans were guaranteed by RPC's CEO, Ross, who himself was defending against the bank in a suit to enforce the guarantee. In that suit Ross was asserting counterclaims identical to the claims RPC sought to advance in its litigation. Id. at 117-18.
 
 
 86
 The trustee sought to retain as special counsel for the estate the same firm that was representing Ross in his suit against the bank. Id. at 118. The firm agreed to take the case on a contingency fee basis, and Ross agreed to advance the fees and costs the firm would incur in its representation of the estate in exchange for the firm's promise that it would reimburse him for those advances and his own fees out of the firm's contingency fee. Id.
 
 
 87
 The court noted that while dual representation of the trustee and a creditor might appear to raise conflict of interest concerns, "[t]he naked existence of a potential for conflict of interest does not render the appointment of counsel nugatory, but makes it voidable as the facts may warrant. It is for the court to decide whether the attorney's proposed interest carries with it a sufficient threat of material adversity to warrant prophylactic action." Id. at 119 (quoting In re Martin, 817 F.2d 175, 182 (1st Cir.1987)) (alteration in original).
 
 
 88
 The court approved the retention because, as is the case here, " 'the interests of the estate and the firm's clients are identical with respect to the firm's duties as special counsel.' " Id. at 120 (quoting Fondiller, 15 B.R. at 892). The estate's proposed suit was identical to Ross' suit, the firm had undertaken extensive litigation concerning Ross' claim against the bank and limited retention under the circumstances would "save the estate 'the added expense that would be generated by retention of counsel unfamiliar with the facts and proceedings.' " Id. (quoting In re Iorizzo, 35 B.R. 465, 469 (Bankr.E.D.N.Y.1983)).
 
 
 89
 Like here, the bank objected that the estate was forgoing valid claims against Ross because of the relationship between Ross and the estate brought about by the estate's retention of proposed counsel. The court noted that "[t]he slight possibility of those claims, however, will not bar the retention of [chosen special counsel] for the special purpose of pursuing claims against the Bank," and credited the Trustee's decision not to bring suit against Ross, a decision made in advance of the application to appoint special counsel. Id.
 
 
 90
 Retention is proper here for the same reasons it was approved in RPC--an identity of interests between the trustee and special counsel's former client with respect to the special matter for which special counsel is retained.
 
 
 91
 That is, with respect to the matter for which Caddell is being retained--the Trustee's Texas Action--Wells and the Estates share an identity of interests. The Trustee, in the Trustee's Texas Action, and Wells, in the Wells' Texas Action, each seek to establish the same set of predicate facts in order to prevail over many of the same defendants. To the extent that Wells has interests adverse to the Estates, by virtue of his status as a defendant in the derivative or other potential claims, as the bankruptcy court found, those interests are not within the scope of Caddell's representation. Caddell has never represented any interests that are adverse to the Estates with respect to the subject matter of the cases it has been hired to litigate, and as a result does not run afoul of section 327(a) or (c).
 
 
 92
 Appellants complain that the Trustee chose to file the Trustee's Texas Action only because Wells, through Caddell, "hijacked" the Trustee to protect himself and advance his personal agenda. But the record shows that the decision to file the Trustee's Texas Action was made by the Trustee on the advice of his general counsel, Coan, Lewendon, not by or on the exclusive advice of Wells or Caddell. Although appellants argue that the Trustee failed to investigate independently the validity of claims made in the Trustee's Texas Action, the record belies this contention. To be sure, during its investigation the Trustee received considerable information from Wells, a principal player in AroChem's complicated history. But Wells and Caddell were not the exclusive source of the Trustee's information. To the contrary, there is record evidence that the Trustee's general counsel reviewed AroChem's internal records; reviewed accounting records prepared by an independent auditor following the discovery of wrongdoing in 1990; consulted with a forensic accountant about the viability of claims against the Bank Group and the Victory Group; discussed with counsel for Victory the validity of the Victory Group's claims against Wells and others; discussed with counsel for the Bank Group the validity of the Bank Group's claims against Wells and the Victory Group; discussed with Caddell claims against Wells, the Bank Group, Victory Group and others; and ultimately made an independent analysis of the AroChem Estates' causes of action. This investigation consumed between 150 and 200 hours of attorney time in the summer of 1994. Caddell was retained after the Trustee's general counsel completed its investigation.
 
 
 93
 At bottom, appellants' claim that Wells and Caddell "hijacked" the Trustee is an indirect attack on the Trustee's decision to file the Trustee's Texas Action in the first place. Perhaps the Trustee could have chosen to pursue Wells rather than the defendants named in the Trustee's Texas Action. But the bankruptcy court made a finding, for which there is support in the record, that the Trustee made an independent investigation and concluded that the Estates would best be served if the Trustee aligned itself with Wells and pursued the Bank Group and Victory Group instead. Appellants--principal defendants in the suit the Trustee chose to pursue--are understandably displeased with this decision. But their objection here is to the retention of Caddell and that inquiry is guided by section 327(a). On that score the bankruptcy court found no disqualifying adverse interests at play.
 
 
 94
 Because the bankruptcy court's conclusions on this score are supported by the record and are not clearly erroneous, we should not substitute our judgment for that of the bankruptcy court. Bankruptcy judges' findings on conflict of interest questions are entitled to deference because a bankruptcy judge "is on the front line, in the best position to gauge the ongoing interplay of factors and to make the delicate judgment calls which such a decision entails." In re Martin, 817 F.2d at 182. Moreover, if the bankruptcy judge were later to perceive a materially adverse interest, "he has at his disposal an armamentarium of permissible remedies, including ... disqualification [and] disallowance of all or some fees." Id. at 182-83 (cited with approval in In re BH & P, 949 F.2d at 1313).
 
 
 95
 E. Is the Caddell Firm "Disinterested?"
 
 
 96
 As noted above, it is not enough under section 327(a) that counsel "not hold or represent an interest adverse to the estate"--counsel also must be "disinterested." The characteristics of a "disinterested person" are set out in 11 U.S.C. § 101(14). In this case the relevant requirement is found in subsection (E), which provides that a disinterested person is one that "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor ... or for any other reason." 11 U.S.C. § 101(14)(E).
 
 
 97
 As we explained above in connection with section 327(a), Caddell does not personally "hold" any interests adverse to the Estates with respect to the matters it has been hired to litigate. It follows, therefore, as the bankruptcy court found, see 181 B.R. at 700, that Caddell does not personally "have" any such interests within the meaning of section 101(14)(E), and it is not rendered "interested" on this basis.
 
 
 98
 Appellants maintain, however, that because Caddell prosecuted claims against creditors on Wells' behalf in the Wells' Texas Action, Caddell does in fact "have an interest materially adverse to the interest of ... [a] class of creditors or equity security holders" within the meaning of section 101(14)(E). We disagree.
 
 
 99
 We believe that section 101(14)(E) is properly read "to implicate only the personal interests" of the professional whose disinterestedness is under consideration. See In re BH & P, 949 F.2d at 1310 & n. 12. Accordingly, to run afoul of section 101(14)(E), a professional personally must "have" the prohibited interest. At most, Caddell "represented" interests adverse to a class of AroChem creditors when it represented Wells in his Texas Action; because Caddell personally does not "have" such an adverse interest, it remains a "disinterested person" within the meaning of section 101(14)(E).
 
 
 100
 This reading is supported by section 327(a), which authorizes the trustee to employ professionals "that do not hold or represent an interest adverse to the estate and that are disinterested persons." 11 U.S.C. § 327(a). By its terms, section 327 distinguishes between "holding" an interest and "representing" one. Section 101(14)(E), in contrast, refers only to those who "have" disqualifying interests. Like the BH & P Court, we do not find this choice of language accidental. See 940 F.2d at 1310 n. 12. If "to have" and "to represent" were identical considerations, the trustee never could hire counsel to bring claims against a class of creditors because, once retained, such counsel would "represent," and therefore "have," an interest materially adverse to the interest of a class of creditors, i.e., the estate's interests against the creditors. The anomalous result would be that all such counsel automatically would be "interested" and thus disqualified.
 
 
 101
 Appellants' citation to Roger J. Au & Son v. Aetna Ins. Co., 64 B.R. 600 (N.D.Ohio 1986), is unavailing. There, the court disqualified counsel that had an actual conflict with the estate. The court opined that any counsel that failed the "disinterested" test because it had an interest adverse to the estate automatically failed the section 327(a) adverse interest test, and thus, for the purpose of such an inquiry, " 'having' an interest adverse to the estate, and 'holding or representing' an interest adverse to the estate are identical considerations." Id. at 604.
 
 
 102
 But a close reading of Roger J. Au reveals that it did not hold, as appellants contend, that as a general matter, "holding or representing" and "having" mean the same thing. To the contrary, the court held that within the section 327(a) scheme, "having an interest adverse to the estate " is identical to "holding or representing an interest adverse to the estate." Id. Thus Roger J. Au was correct when it stated that "both prongs of the [327(a) ] test are satisfied where counsel is not a 'disinterested person,' " because counsel that fails the disinterested test on the ground that it "has" an interest adverse to the estate automatically fails the first prong of the test because, by definition, it also "holds" such an interest. Have and hold are synonymous.
 
 
 103
 In contrast, however, if the interest at issue is one adverse to a class of creditors or equity security holders, only section 101(14)(E) is involved, and that section employs only the word "have." Because Caddell does not "have" an interest materially adverse to a class of creditors, it is not rendered "interested" on that basis and does not run afoul of section 101(14)(E).
 
 CONCLUSION
 
 104
 For the reasons set out above, we affirm the findings of the bankruptcy court that, with respect to the limited scope of its retention, Caddell (1) does not "hold or represent an interest adverse to the Estates," and (2) is a "disinterested person." The order authorizing the Trustee to employ Caddell is affirmed.
 
 
 
 [1]
 The Bank Group consists of Bank Brussels Lambert, Banque Indosuez, Chase Manhattan Bank, N.A., Swiss Bank Corporation, and Skopbank
 
 
 [2]
 The Victory Group consists of Victory Oil Company, Victory Holding Company, The Crail Fund, Eric C. Johnson, Sherry L. Hutchinson and the Estate of Robert Johnson
 
 
 [3]
 The bankruptcy court used the term "Bank Group" to refer collectively to both the Bank Group and the Victory Group. 181 B.R. at 697
 
 
 [4]
 The district court also noted its willingness to grant leave to appeal under section 158(a)(3), which allows a party to appeal from a nonfinal order of the bankruptcy court "with leave" of the district court. Because section 158(d) limits this Court's jurisdiction to appeals over "final" orders, however, a district court order issued under 158(a)(3) is, by definition, not appealable to the court of appeals under section 158. In re Chateaugay Corp., 922 F.2d 86, 90 (2d Cir.1990)
 
 
 [5]
 Because we assert jurisdiction under section 158(d), we need not address whether the district court's order is appealable under the Cohen collateral order doctrine
 
 
 [6]
 We are aware that Palm Coast may cut against the grain of prior Circuit precedent. See, e. g., In re Prudential Lines, 59 F.3d at 331 (restricting notion of "discrete dispute" to something more than "mere[ ] competing contentions with respect to separable issues") (citation and internal quotation marks omitted); In re Johns-Manville, 824 F.2d at 179 (declining to exercise jurisdiction over an appeal from an order denying the request of shareholders for official committee status because the order did not "conclusively determine[ ] a separable dispute over a creditor's claim or priority" (internal quotation marks omitted)). Nonetheless, once Palm Coast was decided it became binding precedent, see S & R Co. of Kingston v. Latona Trucking, 159 F.3d 80, 83 (2d Cir.1998), and we are bound to follow it "unless and until it is overruled by the Court en banc or by the Supreme Court," Jones v. Coughlin, 45 F.3d 677, 679 (2d Cir.1995) (per curiam)