Lucien A. MORIN, II, Trustee of Aapex
Systems, Inc., Plaintiff,

v.

FRONTIER BUSINESS
TECHNOLOGIES,
Defendant.

Lucien Morin, II, Trustee In Re:
Aapex Systems, Plaintiff,

v.

Ceres Corporation, Defendant.

Nos. 01–CV–6395L, 02–CV–6151L.

United States District Court,
W.D. New York.

Jan. 22, 2003.

Jeffrey A. Dove, Menter, Rudin & Trivelpiece, P.C., Syracuse, NY, for Aapex Systems, Inc.

David C. Fielding, Lischer & Schop, P.C., Buffalo, NY, for Frontier Business Technologies.

## DECISION AND ORDER

LARIMER, Chief Judge.

These two cases, which I am consolidating for purposes of this appeal pursuant to Fed.R.Civ.P. 42(a) (made applicable to this proceeding by Fed. R. Bankr.P. 7042 and 9032), arise out of a Chapter 7 case involving debtor Aapex Systems, Inc. ("Aapex"). In *Morin v. Frontier Business Technologies, Inc.*, 01–CV–6395, Bankruptcy Judge John C. Ninfo, II, issued an Order on July 5, 2001, granting the Trustee's motion for summary judgment on his claim seeking to avoid a transfer of $11,853.97 made by Aapex for the benefit of defendant-appel-

lant Frontier Business Technologies, Inc. ("Frontier"). In *Morin v. Ceres Corp.*, 273 B.R. 35 (Bankr.W.D.N.Y.2002), Judge Ninfo issued a Decision and Order on January 31, 2002, granting summary judgment for the Trustee on his claim seeking to avoid two transfers, totaling $38,558.95, made by Aapex for the benefit of defendant-appellant Ceres Corporation ("Ceres"). Frontier and Ceres have appealed from those orders.

## BACKGROUND

The instant case is not the first to come before this Court in connection with Aapex's Chapter 7 proceeding. On November 21, 2000, the Court issued a Decision and Order in *Morin v. South Williamsport Sabrecom, Inc.*, 00–CV–6137, in which I affirmed a decision by Judge Ninfo denying motions for summary judgment filed by the defendants in three adversary proceedings. Some familiarity with that Decision and Order is required in order to fully understand the background against which the present action comes before this Court.

Aapex, the debtor, was engaged in the business of providing payroll services to employers, including services relating to payroll taxes. The general arrangement was that Aapex would calculate, based upon information provided to it by its employer clients, how much in payroll taxes each employer owed to the Internal Revenue Service ("IRS") or other taxing authorities, and then remit funds (provided to Aapex by its clients) in satisfaction of those amounts to the appropriate agencies.

At some point, whether due to mismanagement or for some other reason, Aapex began running short of cash to make the required tax payments on its clients' behalf. Typically through deficiency notices

from the IRS, Aapex's clients became aware, one by one, that their payroll taxes were not being paid. Sometimes when this occurred, the client would contact Aapex to find out what the problem was. If it were able to, Aapex would then pay that client's tax obligation from whatever funds it had at its disposal, even if the source of those funds was other clients' payments that were intended to satisfy their own tax obligations. In the words of the bankruptcy court, "[b]y the Fall of 1997, AAPEX was running what could only be described as a 'Ponzi Scheme.'" *In re AAPEX Systems, Inc. ("AAPEX I")*, 273 B.R. 19, 32 n. 13 (Bankr.W.D.N.Y.1999).

Like all such schemes, this one eventually collapsed when the money ran out, and when it did, some of the victims stood in a better financial position than others. Specifically, the clients who had contacted Aapex early on to inquire about why their taxes were not being paid owed far less to the IRS than did the other clients, since Aapex, in an attempt to forestall the inevitable, had paid the formers' taxes out of Aapex's own general funds. The latter clients, who had remained unaware of Aapex's scheme until the end, were left with large unpaid tax obligations; the monies that they had transferred to Aapex for the purpose of paying their taxes had been dissipated, at least in part due to Aapex's payments to the IRS on behalf of the other clients.

In the *Frontier* case at bar, on February 6, 1998, Aapex issued a check to the IRS on Frontier's behalf in the amount of $11,853.97, drawn on Aapex's account at Marine Midland Bank[1]. *See* Plaintiff–Appellee's Notice of Motion for Summary

---

**1.** Although Aapex had authority from Frontier to issue checks on Frontier's account to pay the taxing authorities, it did not do so concerning the disputed payments. Payment was made from Aapex's own account at Marine Midland.

Judgment (App.Ex. I), Ex. D.[2] Apparently Frontier had contacted Aapex after receiving a deficiency notice from the IRS. A notice to Frontier dated September 30, 1997, gave the amount owed as of that date as $13,290.14. App. Ex. I, Ex. E. That figure comprised $11,853.97 (the exact amount of the transfer to the IRS from Aapex) in taxes, plus a penalty of $1303.92 and $132.25 in interest.

In *Ceres*, Aapex made two payments to the IRS on Ceres's behalf that are at issue here: a check issued on December 26, 1997 in the amount of $ 32,354.58, for payment of Ceres's taxes, and a check issued on February 11, 1998 in the amount of $ 6204.37, for payment of penalties and interest charges that had been assessed against Ceres by the IRS as a result of its tax deficiency. Again, both checks were drawn on Aapex's account at Marine Midland, and both were issued after the client, Ceres, had received deficiency notices from the IRS. *See* Plaintiff–Appellee's Notice of Motion for Summary Judgment (App.Ex. J), Exs. D, E.

An involuntary Chapter 7 petition was filed against Aapex on February 27, 1998. Between February 4, 1999 and March 29, 1999, the Trustee commenced fifty-eight separate adversary proceedings against former clients of Aapex, seeking to avoid various transfers made by Aapex either to the IRS or state taxing authorities in order to pay the clients' past due payroll taxes or related penalties and interest, or directly to the clients, so that they could pay those past due taxes themselves.

On December 30, 1999, Bankruptcy Judge Ninfo issued a Decision and Order denying motions for summary judgment filed by three of the defendants in those adversary proceedings. Although Judge Ninfo did not find it necessary to determine at that point whether the transferred funds were impressed with a trust under 11 U.S.C. § 7501[3], Judge Ninfo expressed doubt that they were, since the funds had been commingled and were unidentifiable as to their source when transferred to the IRS or the claimant-defendants. *AAPEX I*, 273 B.R. at 30–33.

On November 21, 2000, I affirmed that Decision and Order. In doing so, I stated that "it is difficult to see how" the funds at issue could be trust funds, and that "it would not necessarily have been an abuse of discretion for the bankruptcy court *sua sponte* to have entered judgment on this issue in favor of the non-moving party, the Trustee . . . ." *Morin v. South Williamsport Sabrecom, Inc.*, No. 00–CV–6137, slip op. at 10 (W.D.N.Y. Nov. 21, 2000).

As stated, the two instant cases arise out of the same general events, but there are some variations in the factual details. In the *South Williamsport* case, the clients had simply transferred funds, in an amount sufficient to cover their tax liability, to Aapex, which deposited the funds in its master payroll account. Aapex then made tax payments on behalf of many different clients from that single account.

In one of the cases now before me, *Morin v. Frontier*, Frontier did not transmit funds directly to Aapex. Instead, Frontier would deposit funds for the pay-

---

**2.** "App. Ex." refers to the exhibits submitted in the appeal of each case.

**3.** Section 7501(a) provides that
[w]henever any person is required to collect or withhold any internal revenue tax from any other person and to pay over such tax to the United States, the amount of tax so collected

or withheld shall be held to be a special fund in trust for the United States. The amount of such fund shall be assessed, collected, and paid in the same manner and subject to the same provisions and limitations (including penalties) as are applicable with respect to the taxes from which such fund arose.

ment of payroll taxes into its own bank account. Frontier gave Aapex check-writing authority on that account, but with instructions only to write checks payable to the IRS or other taxing authority. Frontier alleges that Aapex exceeded that authority by writing checks drawn on the account to itself. In short, Aapex misappropriated Frontier's funds that were intended to be used only to pay Frontier's taxes. There is no dispute, however, that the transfer at issue was not made from Frontier's account, but from Aapex's.

In the other case, *Morin v. Ceres Corp.*, Ceres had designated Aapex as its agent pursuant to 26 U.S.C. § 3504[4] and 26 C.F.R. § 31.3504–1(a)[5]. Section 3504 provides a procedure for the IRS, at an employer's request, to designate a third party to act on behalf of the employer in paying the employer's wages to its employees and in performing other duties of the employer relating to the payment of wages, such as paying withholding taxes. The statute and regulation provide that when a third party has been so designated, then "all provisions of law (including penalties) and of the regulations prescribed in pursuance of law applicable to employers in respect of such acts shall be applicable to" both the employer and the third-party agent.

Although Ceres had designated Aapex as its agent under § 3504, Ceres-unlike Frontier-*did* transmit funds for the payment of taxes to Aapex. As will be explained in more detail below, Ceres paid its employees' wages from its own account, using checks prepared by Aapex, but it transferred to Aapex funds intended to be used to pay Ceres's payroll taxes. Appar-

4. Acts to be performed by agents

In case a fiduciary, agent, or other person has the control, receipt, custody, or disposal of, or pays the wages of an employee or group of employees, employed by one or more employers, the Secretary, under regulations prescribed by him, is authorized to designate such fiduciary, agent, or other person to perform such acts as are required of employers under this title and as the Secretary may specify. Except as may be otherwise prescribed by the Secretary, all provisions of law (including penalties) applicable in respect of an employer shall be applicable to a fiduciary, agent, or other person so designated but, except as so provided, the employer for whom such fiduciary, agent, or other person acts shall remain subject to the provisions of law (including penalties) applicable in respect of employers.

5. Acts to be performed by agents.

(a) In general. In the event wages as defined in chapter 21 or 24 of the Internal Revenue Code of 1954, or compensation as defined in chapter 22 of such Code, of an employee or group of employees, employed by one or more employers, is paid by a fiduciary, agent, or other person, or if such fiduciary, agent, or other person has the control, receipt, custody, or disposal of such wages, or compensation, the district director, or director of a service center, may, subject to such terms and conditions as he deems proper, authorize such fiduciary, agent, or other person to perform such acts as are required of such employer or employers under those provisions of the Internal Revenue Code of 1954 and the regulations thereunder which have application, for purposes of the taxes imposed by such chapter or chapters, in respect of such wages or compensation. If the fiduciary, agent, or other person is authorized by the district director, or director of a service center, to perform such acts, all provisions of law (including penalties) and of the regulations prescribed in pursuance of law applicable to employers in respect of such acts shall be applicable to such fiduciary, agent, or other person. However, each employer for whom such fiduciary, agent, or other person performs such acts shall remain subject to all provisions of law (including penalties) and of the regulations prescribed in pursuance of law applicable to an employer in respect of such acts.

Any application for authorization to perform such acts, signed by such fiduciary, agent, or other person, shall be filed with the district director, or director of a service center, with whom the fiduciary, agent, or other person will, upon approval of such application, file returns in accordance with such authorization.

ently Aapex failed to do so timely, for a "Final Notice" of overdue tax from the IRS to Ceres dated February 2, 1998 stated that Ceres had a current balance of $6204.37 (the exact amount of the February 11 transfer from Aapex to the IRS). The notice also indicated that Ceres's most recent payment had been in the amount of $32,354.58 (the exact amount of the December 26, 1997 transfer). App. Ex. J, Ex. E.

As stated, Judge Ninfo granted summary judgment in favor of the Trustee in both these actions, holding that the transfers were avoidable under 11 U.S.C. § 547 [6]. In *Frontier*, he held "that the evidence before the Court establishes that the transfer sought to be avoided by the [Trustee] was made from [Aapex's] bank account, and that no evidence was presented to the Court that would establish that the funds with which the transfer was made originated from [Frontier's] accounts." *Frontier*, slip op. at 2 (Bankr. W.D.N.Y. July 5, 2001).

In *Ceres*, Judge Ninfo held that the funds that Aapex received from Ceres to pay its withholding taxes were impressed with a § 7501 trust when they were received by Aapex. *In re AAPEX Systems, Inc. ("AAPEX II")*, 273 B.R. 35, 42 (Bankr.W.D.N.Y.2002). He also held, however, that when Aapex made the tax, interest and penalty payments to the IRS, the funds used by Aapex to make those payments were not the funds received by

it from Ceres for the payment of Ceres's taxes, and accepted tracing rules would not have shown that the funds used for payment of taxes were the funds advanced by Ceres. Judge Ninfo based that holding primarily on his findings that: (1) the funds paid to Aapex from Ceres had not been segregated, but had been commingled with the funds of the other Aapex clients in Aapex's master payroll account; and (2) after Ceres terminated its relationship with Aapex, the master payroll account was overdrawn on at least two occasions before the transfers at issue were made. In addition, Judge Ninfo held that the funds used to make the penalty and interest payments were never received by AAPEX from CERES, were not withheld from the wages of any CERES employee, and were not required to be held in trust pursuant to § 7501, so that those funds, when paid to the IRS, were not impressed with a § 7501 trust.

## DISCUSSION

### I. Frontier Business Technologies

#### A. Standard of Review

■ In exercising appellate jurisdiction, a district court reviews the Bankruptcy Court's finding of fact under the clearly-erroneous standard, Fed. R. Bankr.8013, and its conclusions of law *de novo*. *In re AroChem Corp.*, 176 F.3d 610, 620 (2d

---

**6.** Section 547(b) provides that, with certain exceptions not relevant here, that the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition;  or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider;  and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made;  and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Cir.1999); *In re Bennett Funding Group, Inc.*, 146 F.3d 136, 138 (2d Cir.1998).

■ Although that principle is well established, the parties disagree about which standard applies here. Frontier contends that since the decision appealed from is one granting summary judgment, the court must review it *de novo*, drawing all factual inferences in favor of the nonmoving party. The Trustee, however, asserts that Judge Ninfo made factual findings that the transfer in question was made from Aapex's bank account, and that there was no evidence that the funds originated with Frontier. Those findings, the Trustee argues, should be reviewed by this Court for clear error.

I agree with Frontier that the proper standard of review here is *de novo*. Although Judge Ninfo did find that the transfer was made from Aapex's bank account, and that there was "no evidence" that the funds originated from Frontier's accounts, that was a *legal* conclusion; essentially, the bankruptcy judge found that as a matter of law, the evidence, even when viewed in the light most favorable to Frontier, was so "one-sided" that the Trustee was entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In other words, he did not weigh *conflicting* evidence; he simply found that "*no* evidence was presented to the Court" that would support a finding in Frontier's favor, and that Frontier had therefore failed to carry its burden of showing the existence of a genuine issue of material fact. Accordingly, "[t]his Court reviews the bankruptcy court's grant of summary judgment *de novo*, taking all factual inferences in favor of the non-moving party." *Bank of America v. Jarczyk*, 268 B.R. 17, 20 (W.D.N.Y.2001) (citing *In re Blackwood Associates, L.P.*, 153 F.3d 61, 67 (2d Cir.1998)); *see also In re M. Silver-*

*man Laces, Inc.*, No. 01 Civ. 6209, 2002 WL 31412465, *3 (S.D.N.Y. Oct.24, 2002) ("On appeal to the district court from an order of the Bankruptcy Court granting summary judgment, the standard of review is *de novo* ").

## B. Whether the Transfer Was Avoidable

■ Viewing the record in the light most favorable to appellant Frontier, I find that there are no issues of fact, and that the decision of the bankruptcy court should be affirmed. The undisputed evidence establishes that the transfer from Aapex to the IRS was made from Aapex's bank account, and there is no evidence to show that the funds could be traced back to Frontier's account.

First, it is beyond dispute that the transfer in question was made when Aapex issued a check to the IRS, dated February 6, 1998, drawn on Aapex's account at Marine Midland Bank, in the amount of $11,853.97. *See* Plaintiff–Appellee's Notice of Motion for Summary Judgment (App. Ex. I), Ex. D. Nor is there any dispute that this transfer occurred within ninety days of the commencement of the bankruptcy case, or that the transfer was for the benefit of Frontier, since it was made in order to pay Frontier's taxes. The only argument advanced by Frontier as to why the transfer should not be deemed avoidable is that the transfer was not a "transfer of an interest of the *debtor* in property ...," 11 U.S.C. § 547(b) (emphasis added), because, according to Frontier, the funds did not rightfully belong to Aapex, but had been "misappropriated" by Aapex from Frontier's account.

In its response to the Trustee's summary judgment motion before the bankruptcy court, however, the only evidence that Frontier submitted in support of that assertion was an affidavit of its president,

Matthew O'Connor, together with a copy of a check dated September 26, 1997, which Aapex had written to itself in the amount of $5898.40, drawn on Frontier's tax account. Frontier alleges that this provides evidence that Aapex, in excess of its authority to issue checks from Frontier's account only to the proper taxing authorities, had converted Frontier's funds to its own use.

O'Connor also states in his affidavit, however, that "when Frontier became aware [of the $5898.40 check] it immediately notified Aapex which immediately reimbursed Frontier." O'Connor Aff. ¶ 6. The only evidence in support of Frontier's assertion that the funds paid to the IRS originated from Frontier's account, then, is that on one occasion about four and a half months before Aapex issued the check to the IRS on Frontier's behalf, Aapex had written a check to itself (in an amount roughly $6000 less than Aapex's February 1998 payment to the IRS), and that upon being questioned about this by Frontier, Aapex "immediately reimbursed Frontier." Thus, there is no evidence that when Aapex issued the check to the IRS in February 1998, there was *any* money in Aapex's account that had been misappropriated by Aapex from Frontier's account.

I also note that Frontier did not oppose the Trustee's motion in the bankruptcy court under Rule 56(f) on the ground that it needed additional discovery, and its position now is that there was no reason to do so, since-in Frontier's view-the bankruptcy court had enough before it to deny the Trustee's motion, without further discovery. I disagree. While I do not mean to suggest that additional discovery would have been appropriate, or that a Rule 56(f) motion, had one been made, would or should have been granted, there was simply insufficient evidence presented to the bankruptcy court to demonstrate the existence of any genuine issue of material fact.

In short, Frontier invites the Court to speculate that because Aapex had once taken funds from Frontier's account in excess of its limited authority, it did so on other occasions as well, and that the funds thus misappropriated can be traced from Frontier through Aapex's account to the IRS. While I recognize that "[t]he courts are directed to apply 'reasonable assumptions' to govern the tracing of [tax trust] funds," *Begier v. IRS,* 496 U.S. 53, 67, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990), the problem here is that there is a lack of evidence that there are any funds to trace from Frontier to Aapex in the first place.

I am also aware that, as Frontier emphasizes, a court deciding a motion for summary judgment must view the record in the light most favorable to the nonmoving party, and draw all reasonable inferences in that party's favor. Nevertheless, it is important to keep in mind that this was a motion for summary judgment, not a motion to dismiss. To successfully oppose the motion, Frontier could not simply postulate some *conceivable* set of facts which would support a judgment in its favor. Rather, it had to come forward with concrete evidence demonstrating the existence of a genuine issue of material fact. As the Second Circuit has observed, "the party against whom summary judgment is sought ... 'must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*'" *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "Although all inferences must be drawn in favor of the nonmoving party, mere specu-

lation and conjecture [are] insufficient to preclude the granting of the motion." *Harlen Associates v. Incorporated Village of Mineola,* 273 F.3d 494, 499 (2d Cir. 2001); *see Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996) ("conclusory statements, conjecture, or speculation" do not defeat summary judgment). Since Frontier's opposition to the Trustee's motion ultimately rested on speculation and conjecture about the source of the transferred funds, the bankruptcy court correctly granted summary judgment in the Trustee's favor. *See United States v. One Parcel of Property Located at 15 Black Ledge Drive, Marlborough, Conn.,* 897 F.2d 97, 102 (2d Cir.1990) (agreeing with district court's conclusion that "[i]n view of appellant's failure to come forward with any evidence to support her assertions that she had no knowledge of drug trafficking from her residence, ... appellant had failed to raise 'a genuine issue for trial' under Rule 56(e)").

## II. Ceres Corporation

I also conclude that the undisputed evidence shows that the transfers that Aapex made to the IRS on behalf of Ceres were avoidable preferential transfers, and that the bankruptcy court correctly granted summary judgment for the Trustee on his claims against Ceres. Although Ceres had designated Aapex as its agent pursuant to § 3504, the evidence presented to the bankruptcy court demonstrated that Aapex never actually had custody or control of the funds that were used for payment of Ceres's payroll, so that the language in § 3504 concerning the agent's tax liability when it performs the employer's payroll-related duties has no application to this case. In addition, Aapex did not segregate any Ceres funds to be used for payment of withholding taxes, but commingled those funds with other clients', so that the funds

transferred to the IRS on Ceres's behalf could not be traced back to Ceres.

As noted, § 3504 provides that "all provisions of law (including penalties) applicable in respect of an employer shall be applicable to" the employer's designated agent, but only when that agent "has the control, receipt, custody, or disposal of, or pays the wages of" the employer's employees. Likewise, 26 C.F.R. § 31.3504–1(a) provides that "[i]n the event wages ... or compensation ... of an employee or group of employees, employed by one or more employers, *is paid by* a fiduciary, agent, or other person, or if such fiduciary, agent, or other person has the *control, receipt, custody, or disposal* of such wages, or compensation," the IRS may authorize that person to perform the acts required of the employer under the Internal Revenue Code "in respect of such wages or compensation." (Emphasis added.) Having been "authorized ... to perform such acts," the agent is then subject to the same "provisions of law ... applicable to employers *in respect of such acts* ...." (Emphasis added.)

The apparent import of these provisions is that the agent is liable under the tax laws to the same extent as the employer, insofar as the agent has *actual* control, receipt, custody, or disposal of, or actually pays, the wages of the employer's employees. If the agent does not perform any of the enumerated acts, then, the agent is *not* subject to the provisions of law applicable to employers "in respect of" those acts.

Ceres contends that "the act of empowering Aapex as CERES' agent [under § 3504] made the obligation to remit payroll taxes to the IRS joint and several ...." Appellant's Brief (Docket # 3) at 11. That begs the question, however. Under the terms of the statute, the designation of Aapex as Ceres's agent made Aapex jointly and severally liable with Ceres for pay-

ment of Ceres's payroll taxes only to the extent that Aapex actually paid Ceres's employees, or had actual control or custody of the funds used to pay the employees' wages. A contrary interpretation would mean that a party such as Aapex could find itself liable for an employer's payroll taxes even if the party had not had any involvement whatsoever in the payment of the employees' wages-in other words, where the party had not truly *acted* as the employer's agent with respect to the payment of wages-solely because that party had been *designated* as the employer's agent by the IRS. The terms of the statute do not indicate that Congress intended such a harsh result.

As stated earlier, the undisputed facts establish that, despite its designation as Ceres's agent under § 3504, Aapex did not in fact pay Ceres's employees' wages. Although Ceres asserts that Aapex had "custody and control" of Ceres's payroll funds, *see* Appellant's Brief at 9, the undisputed evidence shows otherwise.

At the bankruptcy court's request, Ceres filed an affidavit of one of its attorneys setting forth, based on information provided by Ceres's comptroller, the flow of funds between Aapex and Ceres during the payroll preparation and tax remittance process. That affidavit stated, *inter alia,* that:

9. Upon information and belief, pursuant to its authority as CERES' agent, Aapex prepared paper payroll checks with CERES as drawer that were drawn on CERES' payroll account with a third party drawee financial institution (Fleet Bank). These checks were forwarded by Aapex to CERES for actual distribution by CERES to CERES' employees.

10. As CERES' agent, Aapex also obtained electronic transfers from Fleet Bank to individual CERES employees' deposit accounts for CERES employees who had elected direct deposit of their payroll compensation rather than payment by paper check.

The affidavit also states that Aapex reported to Ceres the payroll amounts paid. It states that for withholding tax payments, Aapex, pursuant to its designation under § 3504, effected transfers from Ceres's payroll account at Fleet Bank to Aapex's account at a different bank, presumably Marine Midland. Affidavit of James W. Gormley, App. Ex. R, ¶¶ 9–12.

With respect to payroll payments, then, Aapex "prepared" checks to be distributed to Ceres's employees, but the checks were drawn on Ceres's bank account, with Ceres as drawer, and the checks were actually distributed to Ceres's employees by Ceres. With respect to direct-deposit employees, Aapex did essentially the same thing, but without the issuance of a paper check: it took the necessary steps so that those employees' wages were transferred directly from Ceres's bank account to the employees' accounts.

Unlike the funds used for payment of payroll *taxes,* however, at no time were the funds used for payment of payroll itself ever deposited into an Aapex account, nor did Aapex itself have custody of those funds. Since Aapex thus never has the "control, receipt, custody, or disposal of, or pa[id] the wages of" Ceres's employees, 26 U.S.C. § 3504, the language of § 3504 concerning the agent's liability is not applicable here. *Cf. Kittlaus v. United States,* 41 F.3d 327, 330 (7th Cir.1994) (where partnership that owned motel had contracted with management agent to run the motel, partnership was not liable for payment of income and employment taxes, since "it [wa]s clear that the management agent, not the partnership, possessed [control] over the payment of wages").

I also agree with the bankruptcy court's findings that: even if Aapex was required to segregate the funds that it received from Ceres for the payment of payroll taxes[7], it failed to do so, but rather, commingled those funds with the funds of other clients, making it impossible to trace those funds back to Ceres; and the funds that Aapex paid to the IRS on Ceres's behalf could not be deemed to be Ceres's funds in any event, because by the time Aapex made the payments to the IRS, Aapex's master payroll account had been overdrawn at least twice, on November 17, 1997 and December 4, 1997. *See* Affirmation of Lucien Morin, II (App.Ex. K), Ex. B. It is clear that subsequent to the receipt of money from Ceres, and after the contractual relationship had been terminated in April 1997, Aapex's payroll account had been overdrawn. Indeed, Ceres does not appear to dispute these findings; its argument is that there is no need to trace the funds to Ceres, because Aapex was able to designate the *res* of the statutory trust simply by writing a check to the IRS.

The validity of that argument, however, depends upon Aapex having discharged its *own* tax obligation. In his concurring opinion in *Begier,* upon which Ceres relies, Justice Scalia stated that identification of the *res* was

> made by the taxpayer when it wrote a check upon a portion of a designated fund to the Government. (It is clear from the statutory scheme that the taxpayer has the power to identify which portion of its assets constitutes the trust fund ....) Even if no trust existed be-

fore that check was written, it is clear that a trust existed then.

496 U.S. at 71, 110 S.Ct. 2258. When Justice Scalia referred to the "taxpayer," however, he was not talking about a party who pays someone else's tax obligation, but about the party that *owes* the tax. *See* 26 U.S.C. § 7501(a) (trust exists over amount of tax collected or withheld by "any person [who] *is required to collect or withhold* any internal revenue tax from any other person and to pay over such tax to the United States ...") (emphasis added). If Aapex had no tax obligation of its own, then, no trust with respect to Ceres's taxes existed over Aapex's own funds, which had been collected from various clients, and Aapex therefore had no power to "identify" a part of its funds as the trust *res.*

Ceres appears to recognize this, since its argument centers on its assertion that Aapex, in making the two payments to the IRS on Ceres's behalf, was discharging its own tax obligation. For the reasons stated above, that is incorrect, and accordingly the amounts transferred were not trust funds.

It should also be noted that, as in the *South Williamsport Sabrecom* case, the policy in favor of payment of taxes is not implicated here. *See id.,* slip op. at 8. As the Supreme Court explained in *Begier,* the trust imposed by § 7501 is not really a trust over particular *funds* as much as it is a trust over a particular *amount. See, e.g.,* 26 U.S.C. § 7501(a) ("[w]henever any person is required to collect or withhold any internal revenue tax from any other person and to pay over such tax to the United States, the *amount* of tax so col-

---

**7.** Ceres does not dispute that the funds used by Aapex to make the interest and penalty payment (as opposed to tax payment) were *never* received from Ceres; it argues only that Aapex, in making the interest and penalty payment, was discharging its own obligation because of its agent status under § 3504, an argument that I have rejected for the reasons stated above.

lected or withheld shall be held to be a special fund in trust for the United States") (emphasis added); *Begier,* 496 U.S. at 62, 110 S.Ct. 2258 ("Unlike a common-law trust, in which the settlor sets aside particular property as the trust res, § 7501 creates a trust in an abstract 'amount'-a dollar figure not tied to any particular assets-rather than in the actual dollars withheld"); *see also id.* at 71, 110 S.Ct. 2258 ("When I pay a worker $90 there is no clearly identifiable locus of the $10 in withheld taxes that I do *not* pay him. Indeed, if my total assets at the time of the payment are $90 there is no conceivable locus") (Scalia, J., concurring). Thus, even if the funds transferred from Ceres to Aapex were trust funds at the time of *that* transfer, once they became commingled with other funds, dissipated, and rendered untraceable, the trust was not destroyed, but rather, it remained with Ceres. By way of illustration, assume an employee earns $100, and the employer pays him $90; the employer has withheld $10. *See id.* at 61, 110 S.Ct. 2258 ("[A]ssume that a debtor owes an employee $100 for salary on which there is required withholding of $20. If the debtor paid the employee $80, there has been $20 withheld. If, instead, the debtor paid the employee $85, there has been withholding of $15 ...") (quoting S.Rep. No. 95–1106, p. 33 (1978)). If the employer physically sets aside a $10 bill as the withheld tax, and that $10 bill is destroyed in a fire, the trust is not destroyed along with it; it remains at all times with the employer, until the required tax is finally paid. Thus, even if Aapex *should* have segregated the funds it received from Ceres, the fact that it did not means that the § 7501 trust did not "follow" the dissipated funds, but remained with Ceres, the taxpayer, which remained obligated to hold the amount of withheld funds in trust for the United States.

Ceres also contends that Judge Ninfo erred in finding that Aapex was engaged in a Ponzi scheme. Ceres asserts that this finding is not supported by the record.

The bankruptcy court's decision does state that "a third-party service provider operating a Ponzi scheme should not be allowed to identify or re-identify Section 7501 Trust Funds on behalf of [its] client" in the circumstances presented here, *see AAPEX II,* 273 B.R. at 44. That statement echoed a similar one made in *AAPEX I,* 273 B.R. at 34.

I view this statement simply as reflecting the simple truth that, by the time the payments at issue were made, Aapex was no longer solvent. That much does not appear to be in dispute, and indeed, Aapex's insolvency at the time of the transfers is a prerequisite to their avoidance. *See* 11 U.S.C. § 547(b)(3). Inevitably, then, when Aapex did make a payment to the IRS on behalf of a particular client, Aapex frequently had to use funds that it had received from other clients, even though those clients had intended that their funds be earmarked solely for their own taxes. Were it otherwise, Ceres never would have become delinquent in its tax payments in the first place.

At any rate, the bankruptcy court's statements about a Ponzi scheme were not central to its decision. Even if the evidence did not support such a finding, I would affirm the decision of the bankruptcy court for all the reasons stated above.

## CONCLUSION

The Order of the bankruptcy court entered on July 9, 2001 in *Morin v. Frontier Business Technologies, Inc.,* No. 01–CV–6395, and the Decision and Order of the bankruptcy court entered on January 31,

2002 in *Morin v. Ceres Corp.*, 273 B.R. 35, are hereby affirmed.

IT IS SO ORDERED.